OLSEN, ADMINISTARTRIX, RESPONDENT, v. *MONTANA ORE*
PURCHASING COMPANY, APPELLANT.

(No. 2,398.)

{Submitted April 10, 1907.    Decided April 20, 1907.)

(89 Pac. 731.)

*Torts — Negligent Killing—Mines — Corporations—Liability—*
*Evidence—Sufficiency—Damages—Instructions.*

Negligent Killing—Mines—Action for Damages—Evidence—Sufficiency.

1.    Evidence, adduced in an action against a mining company for damages for the wrongful killing of plaintiff's intestate, alleged to have been done negligently and in intentional disregard of life, in that it caused a large quantity of dynamite to be exploded in a mine in order to prevent the inspection of certain ore bodies then in dispute between it and an adjoining company, by reason of which explosion plaintiff's husband, employed by the rival company, was killed, examined, and *held* to disclose an entire absence of substantive testimony as to how and by whom the powder was exploded, and, therefore, insufficient to support a judgment against the defendant company.

Same—Conspiracy—Evidence—Sufficiency.

2.    Evidence in the action set out in the foregoing paragraph, *held,* also, insufficient to show that the defendant company killed plaintiff's intestate in furtherance of a general plan or conspiracy between it and its officers, to prevent a discovery of the fact that it was extracting ore from disputed ground, in violation of an injunction theretofore issued.

Same—Punitive Damages.

3.    Under section. 4290 of the Civil Code, and section 579 of the Code of Civil Procedure, damages by way of punishment, in addition to those actually sustained, may be recovered in an action against a mining company for the negligent and wrongful killing of plaintiff's intestate, a miner, where the complaint charges that the defendant company was primarily responsible for the death of decedent.

Same—Master and Servant—Punitive Damages.

4.    *Quaere:* May punitive damages be awarded against a mining company for an injury caused by the oppression, fraud or malice of one of its servants for whose conduct it is responsible?

Same—Damages—Instructions.

5.    In charging the jury, in an action to recover damages for the negligent killing of a person, upon the question of determining the pecuniary loss sustained by plaintiff through the death of decedent, the court should submit a definite rule to guide them in arriving at an estimate of such damages as are capable of computation. (*Bourke* v. *Butte El. & P. Co.,* 33 Mont. 267, 83 Pac. 470.)

*Appeal from District Court, Silver Bow County; Geo. M. Bourquin, Judge.*

ACTION by Alice Olsen, administratrix of the estate of Samuel Olsen, against the Montana Ore Purchasing Company. From a judgment for plaintiff, and an order denying it a new trial, defendant appeals. Reversed and remanded.

*Mr. M. S. Gunn,* and *Mr. C. R. Leonard,* for Appellant.

Exemplary damages are not recoverable in an action of this nature. (*Sneed* v. *Marysville etc. Electric Co.,* 149 Cal. 704, 87 Pac. 376; *Langt* v. *Schoettler,* 115 Cal. 388, 47 Pac. 139; *Atchison Ry. Co.* v. *Townsend,* 71 Kan. 524, 81 Pac. 205; 13 Cyc. 363, and note, where cases will be found collated; see, also, *Merchants' & P. O. Co.* v. *Refining Co.,* 69 Fed. 218, 16 C. C. A. 212; *Texas & P. R. Co.* v. *Jones* (Tex.), 29 S. W. 499; *Columbus R. Co.* v. *Bridges,* 86 Ala. 448, 11 Am. St. Rep. 58, 5 South. 864; *Storrie* v. *Marshall* (Tex. Civ. App.), 27 S. W. 224; *Lake Shore & M. S. R. Co.* v. *Prentiss,* 147 U. S. 101, 13 Sup. Ct. 261, 37 L. Ed. 97; *Columbus R. Co.,* v. *Bridges,* 86 Ala. 448, 11 Am. St. Rep. 58, 5 South. 864.)

The court erred in instructing the jury that if they should find the defendant liable, they should find a verdict "for such sum as may be sufficient to compensate plaintiff for all damages sustained by reason of the death of Samuel Olsen, not exceeding the sum of $60,000," in that it does not limit recovery to the pecuniary loss sustained by the next of kin of the deceased. (*Webster* v. *Norwegian M. Co.,* 137 Cal. 399, 92 Am. St. Rep. 181, 70 Pac. 276.)

It was error, also, for the court to tell the jury that they might find a verdict in an amount not exceeding $60,000, without advising them as to the basis upon which damages should be assessed. (*Illinois C. R. Co.* v. *Hicks,* 122 Ill. App. 349; *Hunt* v. *Kile,* 98 Fed. 49, 38 C. C. A. 641; *Hawes* v. *Stockyards,* 103 Mo. 60, 15 S. W. 751; *Gulf Ry. Co.* v. *Killebrew* (Tex.), 20 S. W. 182; *Illinois C. R. Co.* v. *Johnson,* 221 Ill. 42,

77 N. E. 592; *Soyer* v. *G. F. W. Power Co.,* 15 Mont. 1, 37 Pac. 838.)

The verdict is grossly excessive. The rule by which to determine the amount of damages is as follows: 1. Determine the gross amount of prospective earnings; 2. Deduct expenses; and 3. Reduce the net result to present value. (*McCabe* v. *Lighting Co.,* 26 R. I. 427, 59 Atl. 112; *Harrison* v. *Railway Co.,* 116 Cal. 156, 47 Pac. 1019; *Ohio etc. Ry. Co.* v. *Voight,* 122 Ind. 288, 23 N. E. 744; *Atlanta Ry. Co.* v. *Newton,* 85 Ga. 517, 11 S. E. 776; *Chicago & N. W. Ry. Co.* v. *Bayfield,* 37 Mich. 204; *Rudiger* v. *R. R. Co.,* 101 Wis. 292, 77 N. W. 169; *Nelson* v. *Ry. Co.,* 104 Mich. 582, 62 N. W. 993; *Pennsylvania Ry. Co.* v. *Goodman,* 62 Pa. St. 329; see, also, *McKay* v. *Dredging Co.,* 92 Me. 454, 43 Atl. 29; *The Dauntless,* 121 Fed. 420; *Denver Railway Co.* v. *Spencer,* 27 Colo. 313, 61 Pac. 606, 51 L. R. A. 121; *Fox* v. *Railway Co.,* 118 Cal. 55, 62 Am. St. Rep. 216, 50 Pac. 25; *Welch* v. *Railroad Co.,* 86 Me. 552, 30 Atl. 116, 25 L. R. A. 658.) The court will take judicial notice of the standard tables of life expectancy.

The evidence submitted does not furnish any basis from which the jury could determine the pecuniary loss which the heirs of deceased sustained. Under these cihrcumstances only nominal damages should have been allowed. (*Burke* v. *Railway Co.,* 125 Cal. 364, 73 Am. St. Rep. 52, 57 Pac. 1065; *Swift & Co.* v. *Johnson,* 138 Fed. 867, 71 C. C. A. 619, 1 L. R. A., N. S., 1161.)

*Messrs. Maury & Hogevoll,* and *Mr. Robert B. Smith,* for Respondent.

Can a corporation be held to answer for acts done with intentional disregard of human safety, when by reason of such acts, death is caused and when the evidence shows that it authorized it in the beginning, promoted it and brought it about, got the proceeds of the deeds of which the death was but an incident, covered up the crime afterward, held the proceeds and still holds them? The case of *Denver & R. G.* v. *Harris,* 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 1146, answers this query in the affirma-

tive; see, also, *Mainard* v. *Fireman's Fund*, 34 Cal. 48, 91 Am.
Dec. 672; *St. Louis* v. *Dalby*, 19 Ill. 353; *Eastern Ry. Co.* v.
*Broom*, 6 Ex. (Eng.) 314; *Passenger Co.* v. *Young*, 21 Ohio St.
518, 8 Am. Rep. 78; *Brokaw* v. *New Jersey etc.*, 32 N. J. L. 328, 90
Am. Dec. 659; *McKinley* v. *Chicago, etc.*, 44 Iowa, 314, 24 Am.
Rep. 748; *Hanson* v. *European etc.*, 62 Me. 84, 16 Am. Rep. 404;
*Coleman* v. *New York etc.*, 106 Mass. 161; *Moore* v. *Fitchburg*,
4 Gray, 465, 64 Am. Dec. 83.

Corporations have been held liable for false imprisonment (10
Cyc. 1217); for malicious prosecution  (Id. 1216); for conspir-
acy (Id. 1218); for frauds, just as a natural person (Id.
1219); and the usual and accepted and ordinary manner of
proving that a corporation ratified a fraud is to prove that it
adopted the contract by accepting the proceeds of the fraud
(Id. 1220); see, also, *Goddard* v. *Grand Trunk etc. Co.*, 57 Me.
202, 2 Am. Rep. 39.

To hold a corporation responsible for an act which it author-
ized and did and ratified, you must allege it to be the act of the
corporation and the proof must follow the allegation.   (10 Cyc.
1209; *Sullivan* v. *Milling Co.*, 77 Cal. 418, 19 Pac. 757; Kinkead
on Torts, par. 68; *Central of Georgia Ry. Co.* v. *Brown*, 113 Ga.
414, 38 S. E. 989; 13 Ency. of Pl. 921; 1 Chitty's Pleading, 146;
6 Thompson on Negligence, sec. 7478; *Dimarcho* v. *Iron Foun-
dry*, 18 R. I. 514, 27 Atl. 328, 28 Atl. 661; 5 Ency. of Pl. & Pr.
92, and cases cited.)

The jury in cases like this may allow exemplary damages
without an allegation or an instruction on the subject.   (13
Cyc. 177; 5 Ency. of Pl. & Pr. 724.)   The verdict was not ex-
cessive. (*Bowen* v. *Sierra Co.*  (Cal. App.), 84 Pac. 1011;
*Redfield* v. *Oakland*, 110 Cal. 277, 42 Pac. 823; *Bourke* v. *Butte
El. Co.*, 33 Mont. 289, 83 Pac. 470; *Beeson* v. *Green etc. Co.*, 57
Cal. 20.)

MR. JUSTICE SMITH delivered the opinion of the court.

This action was begun in the district court of Silver Bow
county by the plaintiff, as administratrix of the estate of Samuel

Olsen, deceased, to recover damages for the death of said deceased against F. Augustus Heinze, Josiah H. Trerise, James Link, George White, Alfred Frank, Montana Ore Purchasing Company, Johnstown Mining Company, John MacGinniss, William Tyack and Thomas Knight.

The complaint alleges that on or about the first day of January, 1904, the defendants, well knowing, or having reason to believe, that said Samuel Olsen and many other men were working on the six hundred foot level of the Pennsylvania mine, in Silver Bow county, negligently and in intentional disregard of the lives and safety of said Olsen and others working with him, intentionally lowered a certain box or quantity of dynamite and powder, with burning fuse attached thereto, down to, at, and near the said Olsen, and purposely exploded the same, and thereby killed the said Olsen. It is further alleged ''that defendants should not only be made to pay the plaintiff, as administratrix, compensatory damages, but should also be made to pay damages by way of punishment for their premeditated disregard of human safety and to deter others from similar acts.'' Compensatory damages in the sum of $60,000, and punitive damages in the further sum of $50,000, are demanded.

The defendants filed separate answers; each defendant denying that he did, or caused to be done, any of the acts complained of. At the close of plaintiff's case, the trial court sustained a motion for a nonsuit as to all of the defendants, except the Montana Ore Purchasing Company, and overruled a similar motion on the part of that defendant. A general verdict against the Montana Ore Purchasing Company in the sum of $25,000 was rendered by the jury, and judgment was entered thereon by the court. From this judgment and an order denying it a new trial, the defendant Montana Ore Purchasing Company has appealed to this court.

It is contended by the appellant that this is an action wherein the plaintiff counts upon the primary negligence of the Montana Ore Purchasing Company itself, and that therefore the doctrine of *respondeat superior* cannot be invoked by her, in

case the proof discloses negligence on the part of those for whose misconduct the Montana Ore Purchasing Company is responsible as employer. The question was argued at considerable length by the learned counsel for the defendant, but has been eliminated from our consideration by the statement of plaintiff's counsel in their brief and oral argument, that they do not rely upon the rule of *respondeat superior,* but contend that the evidence shows that the defendant Montana Ore Purchasing Company, through its officers in charge of its operations, authorized and instigated the acts that resulted in the death of Olsen. Appellant's main contention is therefore immediately presented, to-wit: Is the evidence sufficient to justify a verdict against the appellant corporation for negligently causing the death of Olsen?

It appears from the testimony that for some time prior to the year 1904 certain rival mining companies in Silver Bow county, to-wit, the Butte and Boston Consolidated Mining Company on the one side, and the Montana Ore Purchasing Company on the other, were engaged in litigation in the federal courts of Montana, such litigation involving, among other things, the question of the course and extent of the veins and the underground workings of the Michael Devitt quartz lode mining claim; that on October 14, 1903, on motion of the Butte and Boston Consolidated Mining Company, the United States court made an order appointing certain persons to inspect, examine and survey the underground workings of the Rarus, Johnstown, Pennsylvania and Michael Devitt lode claims. The object of the litigation was to ascertain the ownership of certain mineral-bearing veins under the surface of the Michael Devitt claim. For the purposes of this case it may be said that the Montana Ore Purchasing Company and its associates were in possession of the Rarus claim, and the Pennsylvania claim was in the possession of the Butte and Boston Company. The object of the inspection was to ascertain if any ores had been extracted from the ground in dispute by the Montana Ore Purchasing Company and its associates, through the workings and openings on the Rarus claim, and to find out if the injunctions of the federal court had been

violated by any of the parties to the action, and whether the Montana Ore Purchasing Company was in contempt of court. The three claims mentioned lie adjacent to each other. For the purpose of opening up the workings of the Rarus claim at the eight hundred foot level, and to find out what, if any, ore was being extracted from the ground in dispute, the Pennsylvania owners, pursuant to the order of the United States court, constructed what was known as the "legal raise," at the end of a short drift, extending out from the six hundred foot level of the Pennsylvania claim, the six hundred foot level of the Pennsylvania being below the eight hundred foot level of the Rarus. At a distance of from seven to ten feet west from the bottom of this "legal raise," in the drift, the Pennsylvania people had constructed an air-tight door to prevent smoke from the Rarus mine coming into the workings of the Pennsylvania mine.

On the twenty-eighth day of December, 1903, the Pennsylvania miners broke through from the "legal raise" into the workings above, and thereupon further work on the raise was interfered with by rocks and timbers being thrown down from the Rarus workings above and the blasting of powder in those workings. On January 1, 1904, the deceased, Olsen, was working on the air-tight door, and was killed by an explosion that occurred somewhere in the raise. He had no powder, and did no blasting himself.

The testimony on the part of the plaintiff tends to establish the following facts, viz.: The defendant F. Augustus Heinze was the president of the Montana Ore Purchasing Company. He knew nothing about the death of Olsen, and, neither as president nor as an individual, did he have anything to do with lowering any powder or dynamite into the mine, and gave no instructions or directions with reference to exploding the same.

One James Cassady, who worked in the Rarus mine, and received his pay at the Montana Ore Purchasing Company's office, was engaged in watching behind a door and instructed not to allow anyone to go through unless they were employed by the company. He quit on December 24, 1903, because the blasting

in the "legal raise," by the Pennsylvania people, was getting so close that the situation became uncomfortable on account of the concussion produced thereby. At that time the Pennsylvania miners were about to break through from the "legal raise," and it was Cassady's duty to stop them, or anyone else, from coming through the door. The eight hundred foot level of the Rarus claim extended into Michael Devitt ground, and, at a point about twenty feet below this eight hundred foot level, a circular crosscut was driven around and into the Michael Devitt ground again. This was known as the "secret" crosscut. A person could come from the eight hundred foot level of the Rarus and drop material down the "legal raise."

At the time of the visit of the United States court inspectors, it was found that mining operations were being prosecuted from the eight hundred foot level of the Rarus under Michael Devitt ground, such operations being carried on from the Rarus shaft, and ore to the value of about $500,000 had already been taken out. This ore was hoisted through the Rarus shaft and sent to the defendant's smelter, and other reduction works designated by defendant. One of the inspectors complained to Thomas Knight, the foreman of the Rarus, that the men making the raise from the six hundred foot level of the Pennsylvania were being interfered with, and Knight promised that it should not occur again.

The foreman of the Pennsylvania mine testified that for a year prior to January 1, 1904, the men in the Rarus had offered resistance to the working of the Pennsylvania mine, by blasting powder, blowing compressed air and smoke into the Pennsylvania, and building "smudges," produced by burning old rags, rubber, overalls, and other materials easily picked up around a mine, so as to produce suffocating smoke that would drive those in the draft of the smoke away from the vicinity. After Olsen's death, it was found that the air-tight door was lying on the Pennsylvania side and was off its hinges. The workmen in the Pennsylvania mine had theretofore forced water through into the Rarus workings and interfered with the working of

that mine, and the Rarus workmen had retaliated in the same manner. There had been explosions by the workmen of the Pennsylvania that interfered with the workings of the Rarus. Evidence that from ten to fifteen sticks of powder had been exploded near the air-tight door was found after Olsen's death. The Rarus miners could get into the top of the "legal raise" by going through the drifts that ran in there. Knight testified that there was no access, so far as he knew, from the Pennsylvania workings to the ground above the "legal raise," but that there must have been some means of getting there, because he discovered men there who did not come down the Rarus shaft. Efforts had been made to prevent an inspection of this ground for some time prior to the twenty-fourth day of December, 1903, but the United States court inspectors visited the ground by means of the Rarus shaft at various times between October 10 and December 31, 1903, and as early as December 24th they discovered that mining operations were going on through the Rarus levels, under Michael Devitt ground.

The witness Winchell testified that every possible effort that could be made had been made to prevent inspection—efforts by legal processes, efforts by armed men, efforts by the construction of bulkheads and doors, the explosion of powder, the rolling of rocks and other material upon the inspectors who tried to gain access. Every effort that could possibly be made to prevent this inspection had been made, according to the testimony of Mr. Winchell. The floor in the workings above the "legal raise" had been planked over, and at one place there was a loose plank which had evidently been recently removed, and on lifting it up one could see into the opening just above the top of the "legal raise." This opening was partially filled with "gob" and hay. Knight's attention was called to this condition, with the request that the Pennsylvania miners who were working in the "legal raise" be not again interfered with, and he promised that there should be no more interference. There was no interference with the United States court inspectors by blasting, but they were

warned at one time on the Rarus side, and by Rarus men, to go back or blasting would be done.

A witness, Bonnell, testified for the plaintiff that at one time, from two to seven days prior to the death of Olsen, he, being at that time in the employ of the owners of the Pennsylvania, was up in the "legal raise" above the drift where Olsen was killed, and heard a man whom he believed to be Nick Treloar, the foreman of the Rarus mine, ask some one above the "legal raise" if the men below were bothering them. Bonnell testified: "He came in there, and he wanted to know if the men below were bothering them any above; that is, the parties where he was— that was supposed to be in the Rarus workings of the Michael Devitt. They said, 'No,' that they were keeping them down by burning this,—I don't know what it was. They had been burning all kinds of stuff up there to keep us men out of the Rarus, keep us from working. There were two parties there. The foreman of the Rarus mine said: 'If you cannot keep them down by burning it, blast.' We found some white fuse there. There was no white fuse used in the Pennsylvania, or, at least if there was, I never saw any. I had seen similar fuse to that found in the Rarus workings, used by the Montana Ore Purchasing Company. This fuse that we found there had been used—burned. There had been fire connected with it, and it had been burned. It had the appearance of fuse that had been recently used, but it would be hard to tell how many hours before we found it, but I would say a very few days before—within a day or so, I think. At the time Treloar spoke, he was twenty or thirty feet away from me. I could not positively swear it was Treloar's voice, but I feel satisfied in my own mind that it was his voice."

It will be noted that there is in this evidence an entire absence of substantive testimony as to how and why the explosion took place. The record may be searched in vain for proof of the identity of the person or persons who did the act. Even though we assume that Olsen was killed by means of blasting powder that came down through the so-called "legal raise," still we are left to conjecture as to the circumstances attendant upon the oc-

currence. If it was intentionally done, it was undoubtedly murder, and no more dastardly crime can be imagined. But, as there is absolutely no proof as to how the powder was exploded, the jury were left to their own inferences upon the one point that was necessary to be proven by the plaintiff, by a preponderance of the evidence, in order to fix a liability upon the appellant.

The respondent contends that the evidence shows that the defendant company and its officers were engaged in a general plan or conspiracy to prevent, by any means and at all hazards, a discovery of the fact that they were extracting ore from the disputed ground, and that they killed Olsen in furtherance of their plans. There is no testimony that would warrant a court in arriving at such a conclusion. It is true that the Rarus people had endeavored to prevent the completion of the "legal raise," by burning rubbish and forcing smoke into the Pennsylvania workings; but there is no proof that they resorted to personal violence or criminal acts in so doing. Indeed, the Pennsylvania miners had broken through the top of the "legal raise" and into the extension of the eight hundred foot level of the Rarus, several days before Olsen was killed, and the United States inspectors had, a week prior to January 1st, discovered the fact that ore to a large amount had been taken from the Michael Devitt veins.

The infirmity in respondent's position is that there is no testimony to show that the killing of Olsen was any part of the general or special plans of the defendant company in resisting the orders of the federal court or incident to the furtherance of such plans. There is no testimony that Olsen was killed by any servant of the Montana Ore Purchasing Company in prosecuting the work that was being done. He may have been killed by an accident, by gross and criminal carelessness on the part of some employee of the Montana Ore Purchasing Company. He may have been killed by a servant of the Montana Ore Purchasing Company in doing some act entirely without the scope of his employment, or by some stranger who got into these workings without

coming down the Rarus shaft.   He may have been killed by the accidental explosion of powder left in the ''legal raise'' by the Pennsylvania miners.  ·The powder that killed him may have been exploded by some intoxicated person in the level above the raise.   One can think of a hundred different situations and contingencies that may have existed, some of them most inconsequent it is true, but human experience teaches that the unexpected and unthought of often happens.

We give these examples simply to illustrate the inevitable conclusion that there is no evidence to show how Olsen met his death, and consequently there is nothing upon which a verdict and judgment can be predicated.   Jurors are not allowed to return verdicts based upon suspicions, conjectures, or probabili ties, however strong and convincing they may be.   There must be some substantive, concrete evidence to justify the judgment of a court.   The legislature has provided for an appeal to this court from all final judgments, so that, in cases like this, a calm, dispassionate, and unbiased review of the testimony may be had, to the end that, in seeking to compensate one person, no injustice may be done to others.   In the death of Olsen, his widow and orphan undoubtedly suffered a great loss, and it is most unfortunate that no legal evidence has thus far been found to fix responsibility for it; but the administration of the law must be uniform in its application, and no exceptions may be permitted because the men charged with its enforcement are actuated by the usual human emotions.   While we find no evidence in the record that the jury acted through passion or prejudice, we do feel that they were carried away by their sympathies, and were moved somewhat, perhaps, by the feeling that compensation should be made to the plaintiff in any event.

As the case must be remanded for a new trial, there are two other questions to be disposed of.   The first is:  Can damages by way of punishment be assessed in an action of this nature?

Section 579 of the Code of Civil Procedure reads as follows: ''When the death of one person, not being a minor, is caused by the wrongful act or neglect of another, his heirs or personal

representatives may maintain an action for damages against the person causing the death, or if such person be employed by another person who is responsible for his conduct, then also against such other person. In every action under this and the preceding section such damages may be given as under all the circumstances of the case may be just." And section 4290 of the Civil Code provides: "In any action for a breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

We see, in principle, and have been able to find in the books, no reason why this general statute (section 4290) should not apply to actions begun by virtue of the legislative permission granted by section 579, when the defendant is charged primarily as the wrongdoer. Indeed, the legislature in framing these sections of the Codes seems to have acted advisedly upon the question we are discussing, as sections 981 and 982 of the Fifth Division, Compiled Statutes of 1887, expressly limited the damages to be recovered to such as the jury should "deem a fair and just compensation, with reference to the pecuniary injuries resulting from such death, to the wife and next of kin of such deceased person," and this limitation is not found in the Codes. Let it be borne in mind that the complaint is that the appellant was directly responsible for the death of Olsen. We do not decide what the rule may be in reference to awarding punitive damages for an injury caused by the oppression, fraud, or malice of a servant for whose conduct the principal is responsible.

The second question arises upon the instructions of the court with reference to estimating the pecuniary loss sustained through the death of Olsen, and the appellant also contends that the verdict is excessive. In this connection we only deem it necessary to call attention to the language of this court in *Bourke* v. *Butte El. & Power Co.*, 33 Mont. 267-289, 83 Pac. 470, and recommended that in all such cases the jury be given some definite

rule to guide them in estimating such damages as are capable of computation.

The judgment and order of the court below are reversed, and the cause remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.