MONSON, RESPONDENT, v. LA FRANCE COPPER CO., AP-
PELLANT.

(No. 2,646.)

(Submitted April 9, 1909.   Decided April 24, 1909.)

[101 Pac. 243.]

*Master and Servant—Personal Injuries—Safe Appliances—Stat-
utory Provisions—Duty of Master—Proximate Cause—Evi-
dence—Insufficiency—Presumptions.*

Master and Servant—Personal Injuries—Safe Appliances—Statutory Pro-
visions—Noncompliance—Liability of Master.
1.   Where the legislature has declared that the master shall adopt
certain precautions to guard against danger to his employees, the com-
mon-law rule of reasonable care is no longer the measure of his duty,
and any failure on his part to observe the required precautions is such
a breach of duty as will render him liable to the servant for any injury
caused to the latter by his disobedience.

Same—Safe Appliances—Legislative Wisdom—Courts may not Question.
2.   In the absence of constitutional limitation upon the power of the
legislature to declare what precautions the master shall observe, or what
appliances he shall adopt, to safeguard the lives and limbs of his em-
ployees, its judgment in this regard is binding, and it is beyond the
power of the courts to inquire into the wisdom of the legislation.

Same—Nonperformance of Statutory Duty—Burden of Proof—Proximate
Cause.
3.   In an action to recover damages for the death of an employee, al-
leged to have been caused through the fault of the employer by reason
of his nonperformance of a statutory duty relative to safeguarding
appliances, the burden is upon plaintiff to show the causal connection
between the negligence as alleged and the injury, i. e., that defendant's
negligence in failing to observe the statutory requirement was the
proximate cause of the injury.

Same—Nonperformance of Statutory Duty—Proximate Cause—Evidence—
Insufficiency.
4.   Evidence in an action against a mining company to recover dam-
ages for the death of one of its employees, claimed to have been caused
through his falling out of a cage while being hoisted out of the mine,
because of defendant's negligence in failing to see that the doors with
which the cage was provided were in place, as required by section 8536,
Revised Codes, *held,* not to show that the alleged negligence was the
efficient cause of the death of plaintiff's intestate.

Presumptions.
5.   The law presumes that a person takes ordinary care of his own
affairs, including his life.

*Appeal from District Court, Silver Bow County; Geo. M.
Bourquin, Judge.*

ACTION by Sadie A. Monson, as administratrix, against the La France Copper Company and others. From a judgment for plaintiff, and from an order denying defendant Copper Company's motion for new trial, it appeals. Reversed.

*Messrs. Gunn & Rasch,* and *Mr. Chas. R. Leonard,* for Appellant.

The evidence fails completely to furnish any light as to the cause of Monson's death or as to the manner in which he was killed. Nor is there anything from which any inference regarding the matter could be legitimately drawn or deduced. The case should not, therefore, have been permitted to go to the jury. (*Olsen* v. *Mont. Ore. Pur. Co.,* 35 Mont. 400, 89 Pac. 731; 2 Labatt on Master and Servant, sec. 837; *Canadian Colored Cotton Mills Co.* v. *Kervin,* 29 Can. S. C. 478; *Dobbins* v. *Brown,* 119 N. Y. 188, 23 N. E. 537; *Fitzgerald* v. *New York Cent. etc. Ry. Co.,* 154 N. Y. 263, 48 N. E. 514; *Deschenes* v. *Concord & M. R. Co.,* 69 N. H. 285, 46 Atl. 467; *Houston & T. C. R. Co.* v. *Löeffler* (Tex. Civ. App.), 59 S. W. 558; *Green* v. *Smith R. Co.,* 5 Am. & Eng. Ann. Cas. 165.)

The deceased assumed the risk. Except for the fact that the duty with reference to the use of doors or gates is a statutory duty as distinguished from a common-law duty, there could be no question but that the deceased assumed the risk and that there would be no right of recovery. (*Coulter* v. *Union Laundry Co.,* 34 Mont. 590, 87 Pac. 973; *Hardesty* v. *Largey Lumber Co.,* 34 Mont. 160, 86 Pac. 29; *McAndrews* v. *Montana etc. Ry. Co.,* 15 Mont. 290, 39 Pac. 85.)

The doctrine of assumption of risk has its foundation in the maxim *Volenti non fit injuria,* expressed in section 6183, Revised Codes, in the words "he who consents to an act is not wronged by it." The principle operates to create exceptions to laws imposing liability where no exception is expressed in the law. It applies independently of any contractual relation. (*O'Malley* v. *South Boston Gas L. Co.,* 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; *Knisley* v. *Pratt,* 148 N. Y. 372, 42 N. E. 986, 32 L.

R. A. 367; *Denver & R. G. R. Co.* v. *Norgate,* 141 Fed. 247, 72 C. C. A. 365, 6 L. R. A., n. s., 981; *Schlemmer* v. *Buffalo etc. R. R. Co.,* 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; *Mad River R. R. Co.* v. *Barber,* 5 Ohio St. 541, 67 Am. Dec. 312; *Birmingham R. R. Co.* v. *Allen,* 99 Ala. 359, 13 South. 8, 20 L. R. A. 457.)

If this court in the *Coulter Case, supra,* when it is said: "The facts in the case as disclosed show that plaintiff knew the danger and assumed the risk. Thereby she made a contract, not against public policy, as appears to us, to assume such risk," intended to decide that assumption of risk by a servant is the result of contract, in the sense that there is an agreement between the master and servant that the servant will assume the risk, it is at once apparent that the court must recede from such holding, in view of the provisions of section 16 of Article XV, Constitution, and sections 5052, 5053, 5243, and 5244, Revised Codes.

The true basis of the defense of assumption of risk being the maxim *Volenti non fit injuria,* it must follow that this defense is available whether the duty, the failure of performance of which creates the risk, is a duty imposed by statute or by the common law. (*Knisley* v. *Pratt, supra; Langlois* v. *Dunn Worsted Mills Co.,* 25 R. I. 645, 57 Atl. 910; *Martin* v. *Chicago etc. R. R. Co.,* 118 Iowa, 148, 91 N. W. 1034, 59 L. R. A. 698; *Birmingham R. R. Co.* v. *Allen,* 99 Ala. 359, 13 South. 8, 20 L. R. A. 457.)

The deceased was guilty of contributory negligence in not placing the gates on the cage before using the same. That this defense is available where the negligence consists in the failure to perform a statutory duty has been held by this court and by the authorities generally. (*Hunter* v. *Montana etc. Ry. Co.,* 22 Mont. 525, 57 Pac. 140; *Beghold* v. *Auto Body Co.,* 149 Mich. 14, 112 N. W. 691, 14 L. R. A., n. s., 609.)

*Messrs. Breen & Hogevoll,* for Respondent.

If the legislature has passed an Act for the purpose of protecting a servant, and made certain provisions in said Act whereby the omission of a certain matter is made a crime, then

and in such event, the assumption of risk does not apply. (*Narramore* v. *Cleveland C. C. & St. L. R. Co.,* 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68; *St. Louis etc. R. Co.* v. *Taylor,* 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; *Hill* v. *Saugestad* (Or.), 98 Pac. 524.)

"Contributory negligence is in many cases held to be no defense to an action for the breach of the statute, which amounts to a willful, wanton or intentional wrong." (Labatt on Master and Servant, sec. 52; *El Paso etc. R. Co.* v. *Foth,* 45 Tex. Civ. App. 275, 100 S. W. 173.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action by plaintiff, as administratrix of the estate of John Monson, her deceased husband, for damages on account of his death in the course of his employment as a pumpman by the defendant corporation in one of its mines in Silver Bow county.

In the complaint F. Augustus Heinze, the manager of the corporation, William A. Kidney, the superintendent of the mine, and Albert Frank, employed as mining engineer, are joined with the corporation as defendants. Defendant Heinze was never served with summons. During the trial the action was dismissed as to defendants Frank and Kidney, and thereafter it proceeded against the corporation alone. As to this defendant, it is alleged that at the time of the death of plaintiff's intestate it was engaged in operating the Lexington mine in Silver Bow county; that there is a vertical shaft in said mine to the depth of fourteen hundred feet, in which cages were used for the purpose of lowering and hoisting the employees; that it was the duty of the defendant to provide these cages with doors to prevent the employees from slipping or falling therefrom while they were being lowered or hoisted; and that the defendant failed to perform this duty, with the result that the deceased, while riding in one of the cages in pursuit of his duties as pumpman under the direction of the defendant, fell from it and was

killed, to the damage of plaintiff in the sum of $25,000. Judgment is demanded for this amount.

The answer, admitting that the defendant was engaged in operating the mine, that there is a vertical shaft therein as alleged, and that the deceased was in its employ at the time of his death, denies generally all the other allegations contained in the complaint. It also alleges affirmatively contributory negligence on the part of the deceased, Monson, and that the risk incident to the use of the cages as alleged was assumed by him. Upon these allegations there was issue by reply. At the close of plaintiff's case in chief defendant moved for a nonsuit, on the ground, among others, that the evidence did not show what was the cause of Monson's death. The motion was denied. When the hearing of the evidence was concluded, motion was made by defendant for a directed verdict. This motion was also denied. The plaintiff had verdict and judgment for $4,000. The defendant has appealed from the judgment and an order denying it a new trial.

The following is a full statement of the evidence submitted to the jury: On January 26, 1908, the defendant was operating the Lexington mine at Butte. The working shaft, fourteen hundred feet in depth, is vertical and has three compartments. One of these is used for pumps. The other two are provided with double-decked cages for lowering and hoisting men and materials. The timbering is constructed in the usual way, in sets, consisting of horizontal wall plates and upright corner pieces of twelve by twelve lumber; the lagging being of two-inch planks. The spaces between the plate timbers, or dividers as the witness designated them, separating the compartments are open, except that in the working compartments there are upright pieces at each end in the middle, to which are nailed guides for the cages. The sets are about five feet in height. It does not appear definitely what the dimensions of the different compartments are, but the working compartments are of sufficient size to permit the use of cages having doorways in the side, of forty-one inches, and to allow a space of two or three inches

for the cages to clear the wall plates and foot sills at the various levels.    Including this space, the horizontal distance from the cages to the lagging, when moving between the wall plates, is fourteen or fifteen inches.    This leaves openings at the sides of the cages, as they pass from plate to plate, of forty-one inches in length by fourteen or fifteen inches in width, being sufficient in dimensions to permit a man to slip or fall out.    Just here it may be stated that, to guard against this danger, cages used in vertical shafts of a greater depth than three hundred feet, or not exclusively for sinking, are required by statute (section 8536, Revised Codes) to be cased in on three sides with sheet iron or steel not less than one-eighth of an inch in thickness, and on the fourth side to be provided with doors or gates of the same material, hung on hinges or adjusted to slide.    They are also required to be covered by a substantial iron or steel bonnet, to furnish protection against anything falling from above.    The cages in use by the defendant at the time of Monson's death were so constructed as to meet the requirements of the statute as to bonnet and sheathing.    The doors were hung on hinges, and so adjusted that, when the cages were not in actual use for lowering and hoisting men during the changes of shifts, they could readily be taken off and set aside, and this was done whenever the cages were used in hoisting ore or waste or lowering timbers and other material.    Each cage was also furnished on each deck with a handbar, which passes across it overhead.    This was used as a handhold by the miners while the cage was in motion.    The company usually had an employee, called a "topman," whose duty it was to put the doors on when a cage was in use by the men, and also to see that they were securely latched or locked before the cage was moved.    At each station where men got on and off there was a station tender to open and close the doors.    The superintendent, the engineers, and foremen, when engaged in inspection or similar duties, commonly used the cages without the doors or other device for protection, depending for safety on the handbar alone.    The same course was pursued by the timbermen when they would be engaged in lower-

ing timbers. The deceased was working on night shift. One pump was installed at the station at the fourteen hundred foot level. This was used to raise the water up to the six hundred foot level to a tank installed there; thence it was pumped to the surface by a second pump, which was operated from that station. These two pumps were kept at work alternately, each for four hours during the shift. The deceased went on shift at 11 o'clock in the evening. After changing his clothes in the dry-room, he asked the engineer in charge of the hoist to lower him to the fourteen hundred foot level. Neither the topman nor the station-tender was usually on duty at that hour. Neither was on duty at this time. The pumpmen were expected to put the doors on a cage when they wished to use it. Usually they omitted to do this, relying for protection on the handbar. The deceased never stopped to put them on even when he took the plaintiff or her friends with him to visit the mine, which he frequently did. He did not put them on at this time. After starting to get into the cage on this evening, he turned back and handed the engineer $15 in bills, saying: "Here is $15. You can keep it for me." Then, upon turning away, he looked back, saying: "I don't care whether you blow it in or not. I might not need it again." The witness stated that other employees at the mine had at other times left their money with him because there was danger of getting it wet while at work. He thought deceased was joking when he made the last remark. At this time the face of deceased appeared unusually pale. He used the upper deck of the cage. There is nothing in the record to show what he did after the engineer let him off at the lower pumping station, until some time after 2 o'clock the next morning. In the meantime the cage had been brought to the surface, but had not been used, nor had the doors been put on. Upon a signal from the fourteen hundred foot level, the engineer returned the cage. Immediately afterward he received a signal to hoist to the six hundred foot level. This he did, setting the upper deck at the station. He observed no jar or irregularity in the movement of the

cage during its ascent; it being, as he stated, so heavy that
impact against some solid body was necessary to produce a per-
ceptible jar while it was in motion. The cage not being released
as the engineer expected, he feared that something was wrong;
so he requested two miners who had just come to the surface
by the other working compartment to make an inspection. They
took the cage by which they had been hoisted and descended to
the six hundred foot level, where they found the other cage stand-
ing as the engineer had placed it. Searching as they descended
from that level, they finally found Monson's body at a point
about sixty feet from the fourteen hundred foot level, stretched
across the compartment through which he had been sent down,
his head and shoulders resting on one of the dividers on one
side, and his feet in the same position on the opposite side,
while the hips were resting on or against one of the wall
plates. Its position was such that a cage could not pass it.
To use the language of one of the witnesses who found the body:
"I don't see what was holding him. He was swinging right
across the shaft." The face was bruised and cut, but there
were no broken bones and no evidence of any other wound. No
blood was found except upon the divider, upon which his head
rested. The lunch basket of the deceased was found in the cage.
There is no evidence whether any cut or bruise upon the face
was mortal. During the early evening, before Monson went to
work, he attended the theater with plaintiff. While there he
remarked twice to plaintiff that he could hear water "rolling."
She attached no significance to these remarks, explaining that
she also heard a noise, but did not know whether it was on the
stage or caused by the cars on the street. Monson had been
hurt at this mine some months before. As a result he had grown
nervous, and after his recovery entertained a dread of the mine.
Upon returning from the theater he had lunch with plaintiff,
and, to use her language, "seemed all right." He had been
spitting blood during the day; this trouble being occasional and
apparently the result of his previous hurt. On parting with
plaintiff he gave her $40, all the money he had, except $15 which

he retained, saying he intended to lend it to a friend at the mine. She tried to induce him not to go to the mine that night. He usually gave his pay checks to plaintiff. He was a large man, weighing one hundred and seventy-five or one hundred and eighty pounds, and was apparently strong and healthy.

The first contention made is that the evidence is not sufficient to warrant a submission of the case to the jury. It is said that the evidence does not show, or tend to show, that the death of Monson was caused by the failure of defendant to see that a door was on the cage at the time Monson was lowered, and then afterward supposedly raised from the fourteen hundred foot level; in other words, while it may be conceded that the evidence is sufficient to establish negligence on the part of the defendant in failing to see that a door was attached to the cage at the time it was used by Monson, there is no evidence showing any causal connection between this negligence and the death itself.

The statute declares: "It is unlawful for any corporation [or person] to sink or work, through any vertical shaft where mining cages are used, to a greater depth than three hundred feet, unless said shaft shall be provided with an iron-bonneted safety cage, to be used in the lowering and hoisting of the employees thereof, said cage to be also provided with sheet iron or steel casing not less than one-eighth inch in diameter; doors to be made of the same material shall be hung on hinges, or may be made to slide, and shall not be less than five feet high from the bottom of the cage, and said door must be closed when lowering or hoisting the men. *Provided,* that when such cage is used for sinking only, it need not be equipped with such doors as are hereinbefore provided for. The safety apparatus, whether consisting of eccentrics, springs or other device, must be securely fastened to the cage, and must be of sufficient strength to hold the cage loaded at any depth to which the shaft may be sunk. The iron bonnet of the aforesaid cage must be made of boiler sheet iron, of good quality, of at least three-sixteenths of an inch in thickness, and must cover the top of such cage in such manner as to afford the greatest protection to life and limb from

anything falling down said shaft. It shall be the duty of the mining inspector and his assistant to see that all cages are kept in compliance with this section and to also see that the safety dogs are kept in good order. Every person or corporation failing to comply with any of the provisions of this section is punishable by a fine of not less than three hundred dollars, nor more than one thousand dollars." (Revised Codes, sec. 8536.)

Section 705 of the Penal Code of 1895 declared that mining cages, subject to the provisos mentioned, should be protected by an iron bonnet. This was amended by the Act of 1897 (Laws 1897, p. 245), which went a step further, and declared that, subject to the same provisos, they should also be sheathed in with sheet iron or steel casing or wire netting of a prescribed strength, and should be provided with doors of the same material hung on hinges or adjusted to slide. The Act of 1903 (Laws 1903, p. 125), now the section of the Code above quoted, amended this provision by requiring the casing to be of sheet iron or steel. From this provision, as enacted, the words "or person" were omitted by the commissioner in the revision of the Codes, evidently through inadvertence, and should be inserted in the text as it now stands. In *State* v. *Anaconda Copper Min. Co.*, 23 Mont. 498, 59 Pac. 854, this court sustained the Code provision as amended by the Act of 1897 as a proper exercise of police power by the state; its manifest design being "to guard against the dangers incident to lowering and elevating men in deep mining shafts."

In the absence of legislation touching the duties of the master, his obligations toward his servant are defined by the rules of the common law, and extend no further than to require him to exercise ordinary care to furnish the servant with reasonably safe and suitable appliances for his use in the performance of his work, reasonably competent fellow-servants, and a reasonably safe place in which to work. (*Longpre* v. *Big Blackfoot Milling Co.*, 38 Mont. 99, 99 Pac. 131.) While a correspondingly greater measure of care is always required whenever the hazard is greater, the exercise of ordinary care, as this expression must

be interpreted in the light of the circumstances of each case, always discharges the master from liability. Even when he has been guilty of a failure in his duty, there must always be shown a casual relation between his fault and any injury for which it is sought to hold him liable. He may be held responsible only when to his lapse of duty is directly attributable the wrong complained of, as any given effect may be attributed or assigned to its efficient cause. When the state has, as in the statute, *supra,* declared that the master shall adopt certain specified precautions, the rule of reasonable care is no longer the measure of duty. The necessity for his compliance with the command of the legislature becomes imperative, and any failure on his part to observe the required precautions or to provide the prescribed appliances is such a breach of duty as will render him liable for any injury caused by his disobedience. Mr. Labatt in his work on Master and Servant, after referring to the fact that many courts hold such disobedience negligence *per se,* while others hold it to be merely evidence of culpability, says: "That the former of these theories is the correct one can scarcely be doubted. A doctrine the essential effect of which is that the quality of an act which the legislature has prescribed or forbidden becomes an open question upon which juries are entitled to express an opinion would seem to be highly anomalous. The command or prohibition of a permanent body which represents an entire community ought in any reasonable view be regarded as equivalent to a final judgment upon the subject matter which renders it both unnecessary and improper that this question should be submitted to a jury." (2 Labatt on Master and Servant, sec. 799.) As was pointed out by Mr. Justice Hunt in *State* v. *Anaconda Copper Min. Co., supra,* so long as there is no constitutional limitation upon the power of the legislature to declare the rule of duty, its judgment is binding, and it is beyond the power of the courts to inquire whether the particular precaution or appliance required is the best or wisest. In *Hunter* v. *Montana Central Ry. Co.,* 22 Mont. 525, 57 Pac. 140, this court, following the weight of authority, held that a railroad

company whose employees in charge of a train failed upon approaching the crossing of a highway to observe the precautions required by a statute for the protection of the public (Civil Code 1895, sec. 908 [Revised Codes, sec. 4289]) was chargeable with negligence. There can be no distinction between the effect of a statute designed to protect the public generally at railroad crossings and one designed to secure safety to servants engaged in hazardous employments. Whether the violation of such a statute is properly designated as negligence or not, the master is responsible for his failure to observe it. But it does not follow that he may be held to respond in damages for an injury not shown to have been the proximate result of his disobedience. As in cases where the rule of ordinary care applies, the plaintiff must prove, not only the injury, but also that it was proximately caused by the negligence alleged (*Pierce* v. *Great Falls & Canada Ry. Co.*, 22 Mont. 445, 56 Pac. 867; *Shaw* v. *New Year Gold Min. Co.*, 31 Mont. 138, 77 Pac. 515; 1 Thompson on Negligence, sec. 45; 2 Labatt on Master and Servant, sec. 803), so in cases where it is sought to hold the master for nonperformance of a statutory duty the evidence must tend directly to show that the fault was the cause of the injury. And, as Mr. Labatt observes: "The nonexistence of a legal connection between the negligence and the injury is predicable whenever, for aught that appears, the accident might have happened even if the defects in question had not existed, or if the precautions which were omitted had been taken. The master cannot be held liable if his negligence was merely a condition as opposed to the efficient cause of the injury." (Vol. 2, sec. 803.) The burden is always upon the plaintiff in such cases to show the causal relation between the negligence and the injury. The efficient cause may be shown by indirect evidence, but even in a civil case a theory cannot be said to be established by such evidence, unless the circumstances are such, not only that they furnish support for the particular theory, but also tend to exclude any other reasonable theory. (*Shaw* v. *New Year Gold Min. Co., supra.*)

Analyzing the facts shown by the evidence before us, and test-
ing it by these rules, we find the neglect of duty on the part of
the defendant and the death of the deceased established beyond
question; for assuming, without deciding, that the requirements
of the statute were met by the defendant by providing doors
such as are shown to have been in use at the time of Monson's
death, the duty to see that they were in place at any time when
the cages were used to lower or hoist employees was a continuing
one, which could not be delegated. But no fact or circumstance
appears from which any reasonable conclusion may be drawn
that this neglect of duty bears a direct proximate causal relation
to the death of deceased. There is no direct evidence that the
deceased got into the cage at the fourteen hundred foot level;
but, assuming that this fact is established by the statement
of the engineer that he set the cage at that station in reply to a
call from the deceased, that the lunch basket of the deceased was
found in the cage, and that his body was found, as it was, about
sixty feet above the fourteen hundred foot level, there is no
evidence as to how the deceased got out of the cage, or whether
he died from a sudden stroke of disease, and then fell to the posi-
tion in which his body was found, or died after he got out
of the cage, having fallen out by reason of such a sudden
stroke. There is nothing to show whether he died from natural
causes or from the violence of a fall, or from being squeezed by
the cage as it passed the timbers. Indeed, it does not appear,
even by remote inference, that he fell any distance. The cuts and
bruises on the face do not appear to have been mortal. The fact
that they were there and that there was blood on the timber is
as consistent with the idea that the deceased died a natural death
as with the idea that he was killed by being caught between the
cage and the timbers or by a fall. Very little additional evi-
dence tending to show death by violence would have been suffi-
cient to distinguish the case from *McGowan* v. *Nelson,* 36 Mont.
67, 92 Pac. 40, *McAuley* v. *Casualty Co.,* 37 Mont. 256, 96 Pac.
131, and *Olsen* v. *Montana Ore. Pur. Co.,* 35 Mont. 400, 89 Pac.
731; but, as it stands, it must be held to fall within the principle

of all of them. Any other conclusion upon such evidence would be a determination of the rights of the parties upon speculative and conjectural inferences, which is not permissible. The case is distinguishable from *Hollingsworth* v. *Davis-Daly Estates Copper Min. Co.*, 38 Mont. 143, 99 Pac. 142, in that the facts and circumstances surrounding the death of Hollingsworth tended to show that the efficient cause of it was the fall into the shaft which had been left in a dangerous condition by the defendant in a place where the employees were expected to go in pursuit of their employment. In that case the conclusion seemed inevitable that the negligence of the defendant caused the injury. Here such a conclusion would be a mere guess.

We have not noticed in this discussion a contention incidentally made by defendant's counsel, that the evidence tends to show that deceased committed suicide. We do not think the peculiarities of his conduct during the evening, in view of the explanations given by the witnesses, would justify any such conclusion. especially so in view of the presumption which the law indulges that a person takes ordinary care of his own concerns, including his life.

The court was in error in denying the motion for nonsuit. This conclusion renders it unnecessary to consider other grounds of the motion or alleged errors based upon the refusal of the court to submit certain instructions. The judgment and order are reversed.

*Reversed.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.