ANDREE, RESPONDENT, *v.* ANACONDA COPPER MINING CO., APPELLANT.

(No. 3,268.)

(Submitted May 24, 1913. Decided June 23, 1913.)

[133 Pac. 1090.]

*Personal Injuries—Master and Servant—Defective Appliances— Evidence—Insufficiency—Nonsuit.*

Personal Injuries—Defective Appliances — Evidence — Nonsuit—Improper Refusal.

1. Evidence in an action by a sawmill employee to recover damages for injuries sustained while unloading logs from flat cars, alleged to have been caused by defendant's negligence in furnishing a defective chain with which to tie the logs, *held,* not to show that the accident was due to any omission of duty on the part of defendant, rather than to the negligence of plaintiff himself, but to present a case in which a motion for nonsuit should have been sustained, for lack of a showing of a direct causal connection between the negligence alleged and the injury—the cause of the accident being left to conjecture.

Same—Conjecture as to Cause—Nonsuit.
   2.   While a showing that the personal injury made the basis of plaintiff's action is more naturally attributable to the negligence alleged in his complaint than to any other cause is sufficient to make out a *prima facie* case, evidence which leaves it doubtful whether the injury may not with equal propriety be attributed to one or more causes other than that alleged does not suffice to meet such requirement.

*Appeal from District Court, Ravalli County; R. Lee McCullough, Judge.*

ACTION by J. A. Andree against the Anaconda Copper Mining Company.   Judgment for plaintiff, and defendant appeals from it and an order denying its motion for a new trial.   Reversed and remanded.

*Mr. R. A. O'Hara,* and *Mr. Henry C. Stiff,* for Appellant, submitted a brief; *Mr. Stiff* argued the cause orally.

There is no direct or positive evidence in the record to sustain the allegation of a defective toggle.   The theory upon which counsel for respondent apparently tried the case was, that as the toggle became unfastened, it must of necessity have been defective.   Unless the doctrine of *res ipsa loquitur* applies, it cannot be said there was sufficient evidence supporting the allegation that the toggle was defective to justify the submitting the case to the jury.   (*Steffen* v. *Chicago & N. W. Ry. Co.,* 46 Wis. 259, 50 N. W. 348.)

The burden of proof was upon respondent to show that the injuries claimed to have been sustained by him were the result of the alleged negligent acts of appellant.   "Negligence will not be presumed, but must be made to appear."   (*Masich* v. *American Smelting Co.,* 44 Mont. 36, 118 Pac. 764; *Shaw* v. *New Year Gold Mines Co.,* 31 Mont. 138, 77 Pac. 515.)

The doctrine announced in the last case cited above was approved in the case of *Winnicott* v. *Orman,* 39 Mont. 339, 102 Pac. 570.

We think it can be properly said that the evidence produced by plaintiff himself showed that he was fully aware of the conditions existing, and that with such knowledge he voluntarily and unnecessarily placed himself in a dangerous position, and

while in such position carelessly, and it might be said even recklessly, with his hand, pushed the toggle of the upper chain, whereupon it became unfastened, and some of the logs rolled off the car and, striking him, inflicted whatever injuries were by him sustained, and we think it was the duty of the court as a matter of law to say, at the close of plaintiff's testimony, that on the showing made he was not entitled to recover, and that the case should not have been submitted to the jury, and that the motion for a nonsuit should have been sustained.

Upon the proposition of the appreciation of danger by the person injured, see the following cases: *Schroder* v. *Iron Works,* 38 Mont. 474, 100 Pac. 619; *Stewart* v. *Pittsburg Copper Co.,* 42 Mont. 207, 111 Pac. 723; *McAllister* v. *Rocky Ford Coal Co.,* 45 Mont. 433, 123 Pac. 696.

*Messrs. W. P. Baker, C. S. Wagner,* and *E. C. Kurtz,* for Respondent, submitted a brief; *Messrs. Wagner* and *Kurtz* argued the cause orally.

There is no positive or direct testimony advancing any theory or reason causing the toggle to become unfastened. Defendant did not offer to prove any cause, nor is there any proof in the record to the effect that the toggle was not defective. There is, however, positive and direct proof that when a toggle is in proper condition, it will not become unfastened by pushing it over the hand. There was no way in which plaintiff could establish any cause or reason for it becoming unfastened, except by showing the accident and the surrounding circumstances, and by witnesses with special knowledge and experience. We believe that such evidence was proper, and we respectfully submit the following authorities, which we believe lend support to our contention: *Copenhaver et al.* v. *Northern Pac. Ry. Co.,* 42 Mont. 453, 113 Pac. 467; Wigmore on Evidence, sec. 1925, 1926, 1976; *Dyas* v. *Southern Pac. Co.,* 140 Cal. 296, 73 Pac. 972; *Webster Mfg. Co.* v. *Mulvanny,* 168 Ill. 311, 48 N. E. 168; *Donk Bros. Coal & Coke Co.* v. *Stroff,* 200 Ill. 483, 66 N. E. 29; *People* v. *Durant,* 116 Cal. 179, 48 Pac. 75; *Yeager* v. *Southern Cal. Ry. Co.,* 5 Cal. Unrep. 870, 51 Pac. 190; *Boston* v. *Hewitt et al.,* 8

Okl. 401, 58 Pac. 619; *St. Louis & S. F. R. Co.* v. *Noland,* 75 Kan. 691, 90 Pac. 273; *Welch* v. *Fransioli,* 46 Wash. 530, 90 Pac. 644.

Where the master owes to the servant a duty to use care, and the thing causing the accident is shown to be under the management of the master, and the accident is such that in the ordinary course of things it does not occur if those who have the management or control use proper care, the happening of the accident in the absence of evidence to the contrary is evidence that it arose from a lack of requisite care. (*Hardesty* v. *Largey Lumber Co.,* 34 Mont. 151, 86 Pac. 29; 29 Cyc. 590; *John* v. *Northern Pacific Ry. Co.,* 42 Mont. 18, 111 Pac. 632; *Graaf* v. *Vulcan Iron Works,* 59 Wash. 325, 109 Pac. 1016.)

It was not necessary for plaintiff to prove absolutely that the accident arose from the defective toggle. All that was necessary was to make it appear to be more probable that the accident resulted from a defective toggle than from some other cause. (*La Bee* v. *Sultan Logging Co.,* 47 Wash. 57, 91 Pac. 560; *Cleary* v. *General Contracting Co.,* 53 Wash. 254, 101 Pac. 888; *Coleman* v. *Mechanics' Iron Foundry Co.,* 168 Mass. 254, 46 N. E. 1065.) Surrounding circumstances may afford as conclusive proof of the master's negligence as direct testimony. (*Woodman* v. *Metropolitan R. Co.,* 149 Mass. 335, 14 Am. St. Rep. 427, 4 L. R. A. 213, 21 N. E. 482; *McCord* v. *Atlanta & C. Air Line Co.,* 134 N. C. 53, 45 S. E. 1031; *Northern P. R. Co.* v. *Hess,* 2 Wash. 383, 26 Pac. 866; *Chenall* v. *Palmer Brick Co.,* 117 Ga. 106, 43 S. E. 443.) So it has been held that the mere fact that a steel rail fell from a car, one end striking the ground and the other end sweeping along the side of the train and striking and killing a brakeman, was sufficient to raise a question of negligence for the jury, although there were no other circumstances indicating negligence. (*McCray* v. *Galveston, H. & S. A. R. Co.,* 89 Tex. 168, 34 S. W. 95; *Stewart* v. *Ferguson,* 164 N. Y. 553, 58 N. E. 662; *Lentino* v. *Port Henry Iron Ore Co.,* 71 App. Div. 466, 75 N. Y. Supp. 755.) In the case at bar there was not only proof of an injury, but there was also proof showing how the injury happened, and the manner in which

the injury was produced. Under these circumstances, the jury had a right, without proper explanation on the part of the defendant, to infer that the toggle was defective, and that the defendant had been negligent. (*Howser* v. *Cumberland etc. R. Co.*, 80 Md. 146, 45 Am. St. Rep. 332, 27 L. R. A. 154, 30 Atl. 906; *Benedick* v. *Potts*, 88 Md. 52, 41 L. R. A. 478, 40 Atl. 1067.)

The argument of counsel for appellant that there is no direct or positive evidence of a defective toggle would seem to infer that such evidence is always necessary. Authorities are practically uniform in their holding that such evidence is not always required. (See *Shaw* v. *New Year Gold Mines Co.*, 31 Mont. 138, 77 Pac. 515; *Beeler* v. *Butte etc. Development Co.*, 41 Mont. 465, 110 Pac. 528.) Furthermore, it is not always necessary to show what the exact nature of the defect was. (*Nelson* v. *St. Paul Plow Works*, 57 Minn. 43, 58 N. W. 868; *Atchison etc. Co.* v. *Lannigan*, 56 Kan. 109, 42 Pac. 343; *Magnum* v. *Bullion etc. Co.*, 15 Utah, 534, 50 Pac. 834.)

This court has often announced the rule that, where different conclusions may reasonably be arrived at from the evidence in the case, as to whether there was negligence on the part of the employer, the question is one of fact to be submitted to the jury. (See *Domitrovitch* v. *Stone & Webster Engineering Co.*, 44 Mont. 7, 118 Pac. 760; *Maw* v. *Coast Lumber Co.*, 19 Idaho, 396, 114 Pac. 9; *Keast* v. *Santa Ysabel Gold Min. Co.*, 136 Cal. 256, 68 Pac. 771; *McCabe* v. *Montana Cent. Ry. Co.*, 30 Mont. 323, 76 Pac. 701.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action for damages for personal injuries suffered by plaintiff during the course of his employment by defendant at its sawmill at Hamilton, Ravalli county. The defendant transports its supply of logs to the mill by a railway extending to its forest lands distant therefrom about fifteen miles. The logs are loaded lengthwise on flat cars and are held in place by binding chains. Two chains are used on each car. One end of the first is passed around the middle of the lower half of the load, and, being

drawn tight, is made fast to the other end by means of a finger-link or "toggle" with which the latter is provided. When the chain is adjusted the finger of the finger-link points upward. The length of the chain is such that when it has been secured in place, a portion of it, consisting of a few links, called the "slack," hangs loose. The link at the end of the slack is hooked over the end of the finger in order to prevent the ring, which holds the finger in place, from slipping off and releasing the chain. The second chain is passed around the entire load and is secured in the same manner. The load is further secured by stakes along the sides of the car. A log train consists usually of fifteen cars. When a train reaches the mill it is placed on a track extending along skidways at the pond, and on an incline toward the pond. When the stakes are removed and the chains released, the logs will generally of their own weight roll from the cars upon the skidways and thence into the pond. The ends of the chains are fastened together on the side from which the unloading is done, because the logs would otherwise carry the chains into the pond. The work of unloading is done by persons who are employed exclusively for that purpose. In unloading a car, the stakes are removed, the slack end of the chain to be released is unhooked from the finger of the finger-link, and the link is tripped, releasing the chain. The lower chain is released first. The operation of tripping is accomplished by means of a trip chain. This is provided at one end with a hook which the operator hooks into the finger-link in such a way as to enable him by a quick jerk, after removing the slack, to disengage the finger by forcing off the ring, thus allowing the ends of the binding chain to part. The trip chain is of sufficient length to permit the operator to stand beyond the end of the car and out of the course of the logs as they roll from the car. It sometimes happens that a finger-link becomes jammed or is "grabbed" so that it cannot be tripped by means of the trip chain. The operator then releases the load by cutting one or both of the binding chains on the opposite side of the car with an implement supplied him for that purpose. It is frequently the case that the operator finds the upper chain lying over the lower in such a way as to

prevent the lower from being readily tripped. When this is so, it is necessary for him to push the upper chain off. This is done by the hand or with a peavy, and ordinarily without trouble or danger. At the time of the accident the plaintiff was engaged in unloading logs from defendant's cars. He had unhooked the slack from the finger-links of both chains preparatory to tripping them in the usual way and had hooked his trip chain into the finger-link in the lower chain. Finding that the upper chain was in the way, he undertook to push it aside with his hand. While he was doing this, the finger-link was tripped with the result that the logs in the upper part of the load suddenly rolled upon the skidway, catching and seriously injuring him.

It is alleged in the complaint that the defendant was guilty of negligence, (1) in so loading the car that the "toggle" of the upper chain was superimposed upon the "toggle" of the lower chain, thus causing it to interfere with the free manipulation of the latter, and (2) in furnishing for use as such upper chain "a chain provided with an unsound, insecure and defective toggle," thus rendering the unloading of the car highly dangerous and unsafe. The answer joins issue upon these allegations, and alleges the usual affirmative defenses of contributory negligence, assumption of risk on the part of plaintiff, and negligence of his fellow-servants. The plaintiff had verdict and judgment. The defendant has appealed from the judgment and an order denying its motion for a new trial.

At the close of plaintiff's evidence, counsel moved the court to take the case from the jury and render judgment for the defendant. One ground of the motion was that the evidence did not tend to show that any act or omission of defendant was a proximate or remote cause of plaintiff's injury. The overruling of this motion presents the only question which we are required to determine. Though, after the motion was denied, several witnesses were called on behalf of defendant, no one of them deposed to any fact which materially aided plaintiff's case. Whether, therefore, he made out a case for the jury depends upon his own testimony and that of the witnesses called

by him.   The evidence of these witnesses is so voluminous that it cannot be quoted at length.   The plaintiff had been in the employ of the defendant about three months.   He and his principal witness, Biddiscombe, were assigned the duty of unloading the trains as they came in, and this was their only duty. The following excerpts from the testimony are sufficient to show the circumstances of the accident:

The plaintiff testified: "I never loaded the logs and don't know if I can demonstrate how they are loaded or not.   The chains are supposed to be so that you can work one without interference by the other.   We take our trip chain the first thing we do and walk in and hook it onto the chain we want to trip. The logs on the car which I was unloading were hanging out and if the car is on an incline, the track being also inclined, the springs come down making the incline considerable.   The toggle of the upper chain was on the toggle of the lower chain so as to stop me from tripping the link off; so I went in there and pushed the top chain over.   I was reaching up a little and as I pushed it, the jar of it tripped it off.   There was nothing to stop the logs and they came loose and the first one hit me and knocked me down.   *   *   *   I hooked my trip chain in the bottom chain so I could not trip that one without moving the top chain from over the top of the toggles, and when I did that it came loose and that is all I remember for a time until I came to.   I could not tell from where I stood and reached up to push over the top chain, whether there was any defect in it.   *   *   *   They [the chains] were crossed.   Being crossed, in the performance of my duty there it was necessary in order for me to trip the load,   *   *   *   to push the top chain away further from the toggle of the bottom chain so I could trip it. I was trying to do that when it came loose and the logs tumbled down on me.   The toggle of the top chain came loose.   When I went in there I went in to trip the bottom chain.   I walked in and put my trip chain on the bottom chain and took the slack off the toggles of both chains.   The toggle must have come loose because the logs came down and struck me.   *   *   * When I came to, the top chain was tripped and the bottom chain

was still holding. * * * When I was hurt I was in my regular employment. While working there I think I was a careful man, as careful as anybody could be. Q. At the time you unloaded these logs or attempted to unload them, could you discover from where you were standing any defects in the toggle? A. I could not discover that defect; no. Q. What defect did you have reference to? A. The finger being short. Q. Mr. Andree, from your knowledge of some three or four months there and what you did and what happened there, what would you say, if anything, was there any defect in the toggle or chain on that load? A. Yes, there was. Q. What would you say it was? A. The finger was short. * * * I found toggles crossed or the chains on each other before the time I was hurt. In such cases it was my duty to uncross them or to go around on the other side of the car and cut the chain. I have cut the chains because we couldn't unfasten them any other way. * * * We were furnished with appliances for cutting chains when we considered it necessary. There were nippers there that would cut the chains with very little work. I understood that when the logs could not be safely unloaded otherwise, the chains were to be cut. I don't know that Biddiscombe had any authority over me, any more than that he hired me. I knew when I went in to hook the trip chain I was taking chances. I knew if one of the logs should come down on me it would be liable to kill me or to do me great injury. I knew that all the time. I knew if any mistake or miscue was made in tripping the chain or unloading the logs and one of the logs caught me, I was liable to be all in. * * * There was nothing to prevent me if I saw fit to cut the chain or trip the top chain. I always consulted Biddiscombe before cutting a chain, as he was the foreman. * * * I consider myself a man of intelligence and prudent in the ordinary affairs of life. I went up and put my hand on that toggle and pushed it over without noticing its condition. It was impossible to notice. I never heard of another accident of this sort. I do not know whether, when I turned the chain over, I brought pressure on it so that it was released. If the logs are hanging in the chain, there is pressure on the

chain. That is what holds the finger of the toggle and link in position. Yes, I said the chains were one over the other. When I went to release them I could not trip the lower chain until the upper chain was moved. They were crossed right over the toggle. I didn't try to trip the lower chain first. I could tell by looking at it. I have seen both men that worked it before me unloading logs in the same condition that was in. I do not know how long the chain was. There must have been some pressure against the chain that I pushed over, because as soon as I did the logs fell on me. I had had sufficient experiences of the toggle coming in that shape, that is, one over the other. It was not an unusual condition. I have observed the loading of these cars in the woods. You could not tell whether they come into the yard in the same condition in which they are loaded. You would have to follow them down to tell about that. I have seen them loaded in the woods practically in the same way as they loaded these loads.  *  *  *  It was not an unusual thing for cars to come in with the logs on them in the same condition that these were. I want to modify my statement: it was not an extraordinary happening. We might get one car like that in two or three days; get another car in a train of fifteen or twenty cars; get another one on a train to-day and one to-morrow, and may be not another for a week. I had occasion to see them quite often, but that was not the way they generally loaded them in the woods. Q. Then you consider that the condition of the car was due to a fault in the loading of the car; the condition of the chains which caused one chain to be imposed upon another? A. Yes, sir; I considered that to be the real cause of my injury. If the loading had not been defective, the chains would not have been crossed. I thought at the time, and think yet, that the chains were put that way at the time the logs were loaded, and I can see the condition in which they were.  *  *  *  Yes, I moved that chain with my hand intentionally and deliberately, knowing if anything happened to it I would get my body crushed or maybe killed. I knew if it came loose I was liable to be killed. I could have gone to the other side of the car and cut the chains. Our method of work-

ing was to fasten the trip chain and get the other end of it and in that way get out of danger's way. If I put a trip chain on it and walked out to the end of it and tripped the toggle, I wouldn't be taking any chances." In another place in his testimony he said: "I did not know at the time it was possible for a finger to come off that way, the way it did, before it did. That was the first time I ever saw it done, a link to come off the finger in that particular way. * * * I walk in and hook this trip chain in and then take the slack off those chains, off the fingers, both of them. There is the slack of each chain, on the bottom and top chain both; and when I took them off I could see that the finger on the link of the lower toggle could not be tripped on account of a toggle on the upper chain being in the way of it; so I just took it and pushed it over a little bit, and that's the last I remember of for the time being."

The witness Biddiscombe testified: "I was supposed to be foreman there, I guess, and just one man with me. While Mr. Andree was employed there he could have cut the chain without my telling him. I told him not to cut any unless it was absolutely necessary to cut them. I considered it absolutely necessary when the chains were grabbed or caught on the car, when the finger catches so there is no way to get the finger off the link, either that or grabbed, just the two conditions. * * * There is no danger in going in and pushing a toggle over so you can trip the chain if everything is all right. The trip chain should be put on the bottom chain first. If the toggle or upper chain is in the proper condition there would be no danger in pushing it over. I have done it thousands of times with my peavy. * * * There would be no danger in shifting that over at all. It could not well be unless the finger is short, to shove that over with his hand, and if that was a short finger a man's hand slipping it over, that would probably make it come loose. Nothing else could happen in shoving it over; the link would have to slip off the chain. * * * A man standing on the ground or skidway for the purpose of hooking the trip chain would stand with his head—if he was a man of ordinary height—about even with the bunker of the car, and of course the toggles of the

chains would be higher up than his head.   The upper and lower toggle are generally about opposite each other.  *  *  *  It would be no trick at all for me to see it.   The logging train comes down ten or fifteen miles, and the jostling of the train and the slipping of the logs would have a tendency to loosen the toggle before the train got to the pond if the finger was a short one. *  *  *   When a man takes the chain off it will stay in the same position until he goes to push it over or move it, and then it flies up.   If I were going to push one of the toggles off the other I would grab it and put my thumb over the link and keep the link from slipping off the finger of the toggles.   I would do that as an act of caution.  *  *  *   A man standing on the skidway and pushing one toggle off the other would push upwards.   If a man were to push upwards on the toggle he would be doing a careless and improper thing.   I don't know what he would want to do that for.  *  *  *   For cutting chains when it became necessary, we had a pair of chain cutters.   They were there on that occasion.   There was nothing unusual or extraordinary about the chains being crossed.   It was not uncommon; it was a common thing.   Andree must have known that, as he worked his shift night about with me.   His opportunities for knowing were just the same as mine.   I don't remember ever cutting a chain under any conditions other than they were grabbed and when they caught in the bottom of the car.   I think I told Andree not to cut any more chains than he could possibly help; not any more than was necessary.  *  *  *   I do not know what was the condition of the toggle of the particular chain which came unloosed when Andree was hurt.   I didn't observe it before the accident.''

The witness Rooney, who had theretofore been employed by the defendant to unload cars, testified: ''A person could not tell by looking at it when the logs came down in that way, whether the toggle was proper or not.   When the chain is taken off, as a rule the link remains in the same condition until there is some jar of some kind which may move it around.   The fact of the moving of the train might have some effect on the links moved up or down, that would depend upon the strain upon the logs

and the chain. When the chain is taken off and the toggle receives a jar, that would cause the link to slip up. When you have a proper toggle it requires quite a force to unsnap or trip it. The links in the trip chain are about one-quarter inch in size. I have used force enough in tripping the toggles to break the trip chain. * * * It was possible for a toggle to become defective on the way down from the woods. It might be in good condition when the train started with the logs and by the time it reached the pond it might be in bad shape. * * * During the time I was working there, toggles became defective. They would go on the works [to the woods?] in good condition and become defective in loading, hauling and unloading logs. * * * If a man left the slack of the chain on there while he was removing the upper toggle from the lower one, he would be taking less chances than if he undertook to move it after the chain had been removed.''

The chain in question was not exhibited to the jury. It was not examined by any witness after the accident occurred. For demonstrative purposes there were exhibited to the jury two other chains. The witness Rooney was questioned with reference to one of these, as follows: ''Q. Referring to the toggle presented in court by the plaintiff, but which has not been introduced in evidence, I will get you to tell the jury what is the matter, if anything, with that toggle as it now presents itself to you? A. The toggle might be all right enough, but the strain coming down there might bend that. Q. So a short toggle is due to the fact that a strain has been placed upon the finger at or near the bend, which has increased there and thereupon the finger has become shorter? A. Yes, sir. Q. Now, then, Mr. Rooney, I will get you to tell the jury whether or not that bent condition of the finger is not apparent to any log unloader when he approaches the load of logs? A. If he examined it close it might. Q. Would it not be apparent without close inspection? A. Not necessarily. Q. You know that it is bent out of shape now? A. Yes. Q. You knew that when you saw it? A. By examining it closely. Q. Does it require any closer inspection than now, say three feet distant? A. No.''

These excerpts include all the evidence tending to show the
[1]   cause of the accident.  Taking it at its utmost probative
value, it does not tend to show that plaintiff's injury was due
to any omission of duty by the defendant, rather than to the
negligence of plaintiff himself.  Neither the plaintiff nor Bid-
discombe observed the condition of the chain before or after
the accident.  While both ventured the opinion that the accident
would not have occurred if the finger had not been too short,
neither had any knowlege that such was the case.  Let it be
assumed that, in view of their experience in that kind of work,
their opinions are entitled to some weight as tending to show
that the link was defective, that the accident would not have
occurred but for the existence of the defect, and that in the
absence of evidence pointing to another efficient cause, a case
would be made which would call for explanation by the de-
fendant, under the rule as stated in *Callahan* v. *Chicago etc.
Ry. Co., ante,* p. 401, 133 Pac. 687, nevertheless the circum-
stances furnish the basis for an inference equally as conclu-
sive that plaintiff brought the injury upon himself by his
own negligence.  If it be conceded that the loading had been
negligently done because the upper chain was superimposed upon
the lower, this was observed by the plaintiff, and if this added
to the danger, he was made fully aware of the fact and should
have conducted himself accordingly.  His experience because
of which he was willing to express his opinion that the finger was
defective should have guided his conduct with reference to this
condition.  Though because of his position on the ground he was
compelled to reach upward, with the necessary result that the
force applied to move the upper chain would also tend to move
the ring off the finger and thus release it, he first unhooked the
slack when there was no occasion to do so, and without the
least attention to the condition of the link proceeded to move
the chain by pushing it.  This, to quote the words of Biddis-
combe, was "a very careless and improper thing."  According
to the testimony of this witness and that of Rooney, the plain-
tiff should, as a precaution to prevent just what occurred, have
left the slack-guard in place, or, at least, have held the ring

with his thumb until he had accomplished the removal of the chain. So that, assuming that the finger was short because it had become bent, it cannot be inferred from the circumstances attending the accident that it was due wholly to the condition of the finger-link, rather than to plaintiff's own negligence as the sole, or at least a contributing, cause. In other words, the answer to the question whether the injury was due either to the negligence of the defendant in loading the car or the defect in the link, or to both, or, on the other hand, to the careless conduct of the plaintiff in manipulating the chain, is left to rest entirely in conjecture. Upon this condition of the evidence a verdict for the plaintiff cannot stand, because it fails to show a direct causal connection between the negligence alleged and the injury, in the sense in which the rule of law applicable requires. "The nonexistence of a legal connection between the negligence and the injury is predicable whenever, for aught that appears, the accident might have happened even if the defects in question had not existed, or if the precautions which were omitted had been taken. The master cannot be held liable if his negligence was merely a condition as opposed to the efficient cause of the injury." (2 Labatt on Master and Servant, sec. 803.)

In *Patton* v. *Texas & Pac. Ry. Co.*, 179 U. S. 658, 45 L. Ed. 361, 21 Sup. Ct. Rep. 275, the rule applicable here is stated as follows: "And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible, and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." This passage was quoted by this court with approval in *Shaw*

v. *New Year Gold Min. Co.,* 31 Mont. 138, 147, 77 Pac. 515; and the rule as stated was therein approved. (See, also, *Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Olson* v. *Montana Ore Pur. Co.,* 35 Mont. 400, 89 Pac. 731; *Winnecott* v. *Orman,* 39 Mont. 339, 102 Pac. 570.)

It is sufficient to make out a *prima facie* case if the plaintiff [2] can show that the injury is more naturally to be attributed to the negligence alleged than to any other cause (*Griffin* y. *Boston & Albany Ry. Co.,* 148 Mass. 143, 12 Am. St. Rep. 526, 1 L. R. A. 698, 19 N. E. 166); yet this requirement is not met if the evidence leaves it doubtful whether the injury may not with equal propriety be attributed to one or more causes other than that alleged. We have so far assumed that the position of the chains upon the car and the condition of the link point to negligence on the part of defendant. When we view the evidence as a whole, however, it is doubtful whether the condition of the chains was not the result of a shifting of the load produced by the jar incident to the movement of the car during the haul to the mill. If this was the fact—and it was not an unusual occurrence for cars to be found in that condition upon their arrival at the mill—it is fair to conclude that the increased peril thus brought about was one of the ordinary risks of the employment which the plaintiff was hired to assume. From this point of view, the defendant was not chargeable with negligence because of the defect in the link, unless it owed the duty of having the cars inspected before the unloading began. It is a fair inference that this was a part of plaintiff's duties. If it was not, the omission by defendant to have the inspection made by others is not the negligence alleged as the ground of recovery in this case. The motion for nonsuit should have been granted.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE SANNER concur.