SIMONS, APPELLANT, *v.* NORTHERN PACIFIC RAILWAY CO. ET AL., RESPONDENTS.

(No. 7,063.)

(Submitted April 28, 1933.  Decided May 25, 1933.)

[22 Pac. (2d) 609.]

356

*Mr. Walter H. Hanson,* of the Bar of Wallace, Idaho, *Mr. Harry H. Parsons,* of the Bar of San Bernardino, California, *Mr. E. C. Kurtz,* and *Mr. H. L. Maury,* for Appellant, submitted a brief; *Mr. Kurtz* and *Mr. Maury* argued the cause orally.

*Messrs. Murphy & Whitlock,* for Respondents George M. Jennings, A'. T. Haas and A. R. Foss, submitted a brief; *Mr. A. N. Whitlock* argued the cause orally.

*Messrs. Gunn, Rasch & Hall,* and *Mr. Howard Toole,* for Respondents Northern Pacific Railway Company and Northern Pacific Beneficial Association, submitted briefs; *Mr. E. M. Hall* and *Mr. Toole* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The plaintiff, Edna Simons, has appealed from a judgment, entered on separate directed verdicts in favor of each of the defendants, the Northern Pacific Railway Company, a corporation, the Northern Pacific Beneficial Association, a voluntary association, George M. Jennings, A. T. Haas and A. R. Foss; the three individual defendants being of and constituting the medical staff of the Northern Pacific Hospital, at Missoula.

The action was instituted to recover damages for the injuries sustained when a hospital nurse, directed by Dr. Foss to irrigate plaintiff's bladder with a weak solution of boric acid, negligently used a strong solution of bichloride of mercury. The question presented is as to whether, under the facts adduced, the defendants, or any of them, may be held liable in damages for the negligent act of the nurse.

In the voluminous record of 600 pages we find little conflict in the testimony respecting matters material to the issue raised, and therein the history of the establishment and the method of operating the hospital are made reasonably clear.

Years ago the Northern Pacific Railway Company incorporated, in each state along its line of railroad, a "Northern Pacific Hospital Association." The declared purpose of the corporation here organized is "the establishing and conducting hospitals in Montana, to be held and used for the benefit of the Northern Pacific Beneficial Association." The organization to be thus benefited is not incorporated, but has a membership composed of all employees of the railway company, of the beneficial association, and of any corporation in which the railway company holds a majority of the stock. The railway company requires every applicant for a position with it to agree to become a member of the association and to permit the deduction of dues from monthly wages, or he is not employed.

The association has its main office at St. Paul, as does the railway company; it is managed by a board of twenty-four directors, nine of whom are appointed by the railway company,

eleven elected from the various branches of its service, and the remaining four elected for each hospital district from and by the membership in the district.

The association is required to elect as treasurer, the treasurer of the railway company, and the board of directors elects one of its members president. The president appoints for each hospital a chief surgeon, who appoints his staff of physicians and surgeons, subject to the approval of the president, and appoints nurses and other employees, with authority to remove them. The staff and employees are paid by the beneficial association, and the railway company issues to each of the physicians an annual pass on the road and to the nurses trip passes when requested. Under the law, such passes can only be issued to railway employees. In addition, the railway company appoints company doctors throughout the state, who act in conjunction with the hospital medical staff; some of these receive salaries and annual passes, while others have only the passes.

The land on which the Missoula hospital stands was deeded by the railway company to the hospital association (the corporation), to be held by it so long as it is used for hospital purposes and then to revert to the railway company; the real estate all stands in the name of the hospital association; on it no taxes are paid, nor does the beneficial association pay rent for its use.

These hospitals are not operated with the idea of profit, but rather for the protection of the railway company in the care of its employees, but each is authorized to, and does, admit outsiders as "pay patients." The overhead of the hospitals is taken care of by the accumulation of dues of members of the beneficial association, the receipts from pay patients, and monthly payment by the railway company to the beneficial association of $5,000 to its five hospitals located in three states.

The medical staff of the Missoula hospital consists of Dr. George M. Jennings, chief surgeon, and Drs. Haas and Foss, his assistants, each of whom has a private office in the hospital wherein he is permitted to receive and treat outsiders as private

patients, and the three are entitled to use all of the equipment of the hospital, including the services of the nurses, at a small monthly rental. The three doctors mentioned practice privately under an informal arrangement, whereby they jointly pay $60 per month for the use of the hospital, and treat nonmembers of the association, either individually or as a firm.

Mrs. Simons, who had resided in Missoula for years, desired treatment for arthritis; she called Dr. Haas, who referred her to Dr. Foss; she then made an appointment with the latter and was examined, resulting in the doctor's giving her a prescription and directing her to go to the surgery on three successive days for a bladder irrigation with a weak solution of boric acid. Dr. Foss told her that she need not come to him, as the nurse in charge of the surgery was competent to perform the operation; he instructed the nurse to do so. On January 19 and 20 the nurse, Miss Helen Cass, performed the operation as directed and without discomfort to the patient, who after each operation returned home.

The accident happened on the third day, January 21, as follows: The hospital maintains a shelf in the surgery on which drugs in general use are kept in 32-ounce bottles, all alike and identical as to labels except for the name of the drug or solution contained; the name being printed on the label with a rubber stamp. Solutions of boric acid and bichloride of mercury are, naturally, both clear, white liquids; therefore the two, as kept, were identical in appearance, except for the name on the label. While Mrs. Simons was preparing for the operation on the 21st, she and nurse Cass engaged in conversation, and the plaintiff testified that, while talking, the nurse took the bottle from the shelf without looking at the shelf and, without looking at the bottle, poured a portion of the solution into a douche pan used in the operation. Immediately on the introduction of a portion of the solution into the bladder the patient complained of intense burning and so insistent was she that the nurse withdrew the solution from the bladder and washed out the bladder with sterile water, the operation taking about ten minutes.

The nurse testified that she was convinced that she had used bichloride of mercury instead of the boric acid, for, on looking at the shelf, she saw that the bichloride bottle was out of alignment; she further testified that considering the amount of solution used and the amount of water, the solution would be about one of bichloride to two hundred and fifty of water. Dr. Jennings corroborated her in this and testified that such a solution would cause a "first-class" or deep burn. The patient showed all the symptoms of mercury burning and poisoning.

Having washed out the bladder the nurse went immediately to notify the doctors. Dr. Haas and Dr. Foss responded; the former arrived first, as the latter delayed to secure the white of an egg which, however, was not used because of the danger of not being able to get it out of the bladder after it had coagulated. The nurse and doctors testified that the doctors directed the nurse to again wash out the bladder, or to give the patient a douche and enema and prescribed certain medicine to reduce the pain. Dr. Foss advised the patient to remain in the hospital, but she insisted on going home as her husband was ill.

Mrs. Simons testified that she was given no treatment after the doctors arrived. Neither the doctors nor the nurse advised Mrs. Simons as to what had been done to her; she went home about 1:30. About 6 o'clock that evening she was in such pain that on being called, Dr. Foss directed that she be brought to the hospital at once, where she was attended by all three physicians every day for possibly a week, and variously treated for mercurial burns and poisoning and was then sent home with a trained nurse in attendance. The evidence is conflicting as to the extent of the injuries suffered by the plaintiff and as to her recovery. No charge was made for the treatment given either before or after the accident, and Dr. Foss paid all expenses.

The complaint charges the defendants jointly with neglect of duty: (a) In placing a nurse who is not a registered pharmacist in charge of its drug department; (b) in

failing to keep a poison in a container differing in shape and color from that in which nonpoisonous drugs are kept, and in failing to properly label the bichloride bottle; (c) in permitting the label on the particular bottle to become so dirty and blurred as to be indistinguishable; (d) in the use of the poison by mistake; (e) in failing to commence the treatment, later given, immediately upon being advised of the mistake; and (f) in failing to tell the plaintiff what had been done to her so that she could, on their failure to treat her, call in another physician.

As to charges a, b and c, there is no question but that the solution used was properly compounded by a competent, trained nurse in the hospital's dispensary and delivered to the head nurse, Cass, whose duty it was to place the labels on bottles used in the surgery, of which she had sole charge, and there was no proof that the label was not fresh and readable, so that, if the law prohibiting the sale and dispensing of drugs by a person other than a registered pharmacist has application to such transactions in a hospital, it is immaterial here, as the nurse's lack of this qualification was not a proximate cause of plaintiff's injury.

With reference to the keeping of poisonous and nonpoisonous solutions in identical bottles, differentiated only by the inscription on the label, but handled only by the one competent nurse in charge, it was not shown that this method was contrary to approved custom or practice in such institutions, and the recommendations of authorities that such a drug as was here used should be kept in odd-shaped bottles and colored, have reference to the sale over the counter by drug-stores, rather than to hospitals, to prevent mistakes, after the drug has passed into the hands of those not familiar with it. The evidence fails to prove the charge of negligence in pursuing the method adopted. (*Paterlini* v. *Memorial Hospital Assn.*, (D. C.) 241 Fed. 429, 431; affirmed, (C. C. A.) 247 Fed. 639; certiorari denied, 246 U. S. 665, 38 Sup. Ct. 334, 62 L. Ed. 929.)

These charges of negligence have reference to a condition which could only cause injury through some human agency and could only become factors in establishing liability, if proved, on showing negligence, on the part of an agent or employee of the defendants, for whose acts they, or some one or more of them, may be held legally responsible. (*Andree* v. *Anaconda Copper Min. Co.*, 47 Mont. 554, 133 Pac. 1090; *Staff* v. *Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042.)

Much is said *pro* and *con* as to the nature of the beneficial association: Whether or not it is but an operative arm of the railway company or a charitable institution; as to the liability of charitable institutions for the torts of their servants and employees. These discussions are beside the question presented by the facts disclosed. True, the doctors involved constituted the staff of the hospital, but they are also private practitioners and, in their private practice, under the arrangement outlined above, were as independent of the beneficial association or the railway company as are those physicians who are employed to take care of railway patients at their private offices; their "arrangement" respecting the use of the hospital, with its equipment and nurses, amounted to no more and no less than a leasing of the hospital, fully equipped, for their private practice, for which they paid a rental of $60 per month, and required their patients to pay, when hospitalized, the usual charge for the use of the room and for meals.

The hospital association could not even be held liable under the doctrine of a leasing of property on which there exists a known defect, as the plaintiff failed to establish her charge of negligence in the method of handling drugs, and it is admitted that nurse Cass had twenty-five years experience, the last ten of which were spent in charge of the surgery, during which time she had had no accident.

Further, the plaintiff did not choose her physician or physicians because of their employment as Northern Pacific doctors, but because of their reputation in the community and her belief that they were "very good doctors."

With reference to the mistake made by nurse Cass, there is no claim made that the doctors, or Dr. Foss alone, can be held liable on the theory of personal negligence; the operation prescribed was a proper one, did not require the personal attention of a physician; the nurse was competent and had had long experience. If the doctor, or firm of doctors, is liable in this action, it is under the doctrine of *respondeat superior,* in so far, at least, as the initial injury is concerned.

Counsel for the doctors assert that "by many authorities nursing is considered as a profession in itself, like that of a doctor, and the ordinary principles governing the relationship between master and servant have been held not to apply," citing only *Parkes* v. *Seasongood,* (C. C.) 152 Fed. 583. The decision has nothing to do with the relationship existing between a doctor and the nurse he employs to assist him in caring for a patient, as it has to do with the wrong done a hotel keeper by a trained nurse brought into the hotel by a guest to care for his wife, and the cause of the injury was in no way connected with her services as a nurse; the declaration made by the learned federal judge concerning the status of a nurse (unsupported by cited authorities) was unnecessary; had he held that the nurse was the servant of the defendant, the result would have been the same as the act of the nurse, of which complaint was made, was not done in the performance of her duty to her employer; she stepped aside from the performance of her duty to give birth to an illegitimate child and hide it in the hotel.

The mere fact that an assistant to a physician or surgeon is himself, or herself, a member of the same or a similar profession, does not take the employer and employee out of the operation of the rule of *respondeat superior.* A doctor cannot practice his profession by proxy, so, if he sends another physician to treat a patient or perform an operation and the substitute is accepted by the patient, the doctor is not liable for the independent acts of the substitute; but where a physician retains complete control and renounces no part of his

functions as sole physician, but delegates to another the manual administration of the prescribed treatment, the relation of principal and agent exists, whether the person administering the treatment be a layman, a physician, or a nurse. (See 48 C. J. 1136, 1137, and cases cited; *Stokes* v. *Long,* 52 Mont. 470, 158 Pac. 28.) "Obviously, on the simplest principles of agency, a physician or surgeon may be liable for the damage caused by the neglect or default of his employee or servant, or, as it may be, of his assistant who is working under his directions." (21 R. C. L. 393.)

What was said in the case of *Mullins* v. *DuVall,* 25 Ga. App. 690, 104 S. E. 513, 515, is directly in point here. There the physician, defendant, prescribed hypodermic injections in his patient's arm and administered several of these himself, but told her that, "if he was absent from his office when she arrived for a treatment, his office attendant would administer it, and instructed the attendant as to her duty; the negligent act of the attendant resulted in injury for which the physician was held liable. The court declared that: "So far as the question of the amount of skill required by the act is concerned, the direction given amounted to his assurance as an expert that the act was not of such character as to require in his absence the services of another physician, but that in such contingency she might with safety receive the treatment as rendered for him and on his behalf by his office attendant or servant. It was upon such implied assurance, rather than upon any confidence in the professional skill and discretion of defendant's servant, that the patient had a right to rely."

It is generally held that a physician is not liable for the negligence of a hospital nurse, who is not in his employ, if the negligence is in nowise attributable to him personally (48 C. J. 1137), but see *Aderhold* v. *Bishop,* 94 Okl. 203, 221 Pac. 752, 60 A. L. R. 137, wherein it is held that, while operating in a hospital with the assistance of hospital nurses, such nurses are temporarily the servants of the surgeon.

In the instant case reliance need not be placed on the case last cited, for, as above indicated, under the arrangement made the medical staff of the hospital leased the hospital with its equipment and nurses for their private practice and, while attending a private patient at the direction of any one of the three physicians constituting the staff, the nurse here involved was their employee. It is therefore clear that nurse Cass was the agent of Dr. Foss in performing the operation on the plaintiff, and for her negligence he may be held liable under the doctrine of *respondeat superior*, but may Drs. Jennings and Haas be likewise so held on the theory that they were all members of a general partnership?

"It is plain that when physicians and surgeons are in partnership * * * the act of one, within the scope of the partnership business, is the act of each and all." (21 R. C. L. 394, and cases cited.)

Counsel for the defendant doctors sum up the testimony respecting the "arrangement" under which they conducted their private practice as follows: "As to patients who were admitted to the hospital * * * and who remained there for treatment, they would divide the fees. As to all others there was no common interest."

That there is a firm consisting of "Doctors Jennings, Haas & Foss" is advertised to the general public by the use of bill-heads bearing that legend which have been in general circulation in the community for years. These billheads, say the doctors, were sent to "hospitalized patients," while each doctor had his own billheads for use in his private practice.

Dr. Jennings spoke of the "partnership," but testified that it was never reduced to writing, acknowledged before a notary, or recorded. Dr. Haas testified that, if a hospitalized patient failed to pay, the doctors lost their fees and the hospital lost the amount due for room rent.

This testimony, counsel contend, "falls far short of proving a partnership," citing *McCormick* v. *Stimson*, 54 Mont. 272, 169 Pac. 726, and *Bresee* v. *Smith*, 73 Mont. 312, 237

Pac. 492. The arrangements considered in the cited cases present very different situations from that entered into by the doctors in the case at bar. Here the three doctors, being drawn together in the same building by their common employment as the staff of the Northern Pacific Beneficial Association, but not having all of their time taken up, agree, either expressly or impliedly, to treat all persons who come to any one of them, and whose condition is such as to require detention in the hospital for a day or more, as patients of the firm composed of the three, and to divide the fees equally among them and to jointly pay the rent on the hospital for their private practice. As to such patients, each representing himself, they permitted the other to represent him, as a member of the firm of "Jennings, Haas & Foss." By the secret, informal agreement, it was understood, however, that if the patient did not require hospitalization, he or she, became the individual patient of the doctor receiving the patient, and the fees were his. These defendants, therefore, deny that a partnership existed.

The question of such existence is one of fact, to be answered by an examination of the relationship subsisting between the parties. If the facts bring the arrangement within the definition of a partnership, the parties cannot escape liability incident to that relationship merely by saying that no such thing exists. The question of what constitutes a partnership is one of law, to be determined by the court, and, of course, communicated to the jury by appropriate instructions. (The Law of Partnership by Strahan & Oldham, 5th ed., 26; Mechem's Elements of Partnership, 2d ed., 58.)

A "partnership" is defined as "the association of two or more persons, for the purpose of carrying on business together, and dividing its profits between them." (Sec. 7981, Rev. Codes 1921.) A partnership can only be formed by the consent of all the parties thereto (sec. 7982, Id.), and no one can be held liable as a partner who is not such in fact, or unless he has permitted himself to be held out as a partner to third persons to whom such representation has been communicated, and who,

in good faith, gives credit to the partnership. (Secs. 8006, 8007, Id.)

A partnership agreement need not be in writing and it may be express or implied. It is only on the creation of a special partnership that the law requires the formalities suggested by the testimony of Dr. Jennings. (See secs. 8027–8032, Rev. Codes 1921.) Every general partner is the agent of the partnership in the transaction of its business. (Sec. 7997, Id.)

In order, therefore, to hold two or more persons liable as partners, it must be shown that they consented to become partners and acted as such in the carrying on of business, divided the profits as such, and occupied the interchangeable position of principal and agent, and, where the business is such as to require the use of property, there must be a community of title. (*Weiss* v. *Hamilton,* 40 Mont. 99, 105 Pac. 74; *Croft* v. *Bain,* 49 Mont. 484, 143 Pac. 960.) No agreement to share in the losses need be shown, as the law presumes such sharing from the sharing of profits, unless by express agreement to the contrary (sec. 7986, Rev. Codes 1921), and even such an express agreement would not destroy the partnership. (*Lomme* v. *Kintzing,* 1 Mont. 290.)

To establish the existence of a partnership it is not necessary that its elements be proved by direct evidence (*Silver* v. *Eakins,* 55 Mont. 210, 175 Pac. 876), and a billhead purporting to show the names of the partners is competent evidence on this question. (*Knight* v. *Richter,* 11 Mont. 74, 27 Pac. 392.)

The evidence is sufficient to warrant a finding that the three doctors are partners; in fact, the question is not so much as to the existence of the partnership as the liability of the partners under the facts shown.

The plaintiff testified: "I called Dr. Haas because I considered him a very good doctor, and his associates were very good doctors and I thought with the combination of doctors I might find out what was causing the arthritis." Asked as to why she went to Dr. Haas in the first instance, the witness answered, "Because he is a member of the firm of Jennings,

Haas & Foss.'' She was later asked the question as to whether, after calling him, she was ''released'' by Dr. Haas; to which she replied, ''I have never been released by any of those doctors.'' When she called Dr. Haas and explained her ailment, he told her that he did not do that kind of work; that Dr. Foss was their man for it and that she would find him a very able man; he directed her to call Dr. Foss, which she did; he told Foss that she was coming to see him. The plaintiff attempted to testify that she had known that there was a partnership between Drs. Jennings, Haas and Foss for ten years prior to her injury, but the testimony and an offer of proof to that effect were excluded.

It is asserted that the fact that, on her first examination, Dr. Foss gave to the plaintiff a prescription on which his name alone appeared, is some evidence that she was his patient only, but this fact has no probative value, as the doctor testified that the firm had no joint prescription blanks; had the plaintiff been hospitalized, the prescription would have been the same.

Counsel for the doctors contend that an ''apparent'' partner ▮▮▮ is not liable in a tort action, citing Pollock on Partnership, eleventh edition, 61, where it is said that: ''To make a man liable in tort as an apparent partner involves a confusion of principles. Liability by 'holding out' rests on the presumption that credit was given to the firm on the strength of the apparent partner's name. This has no application to causes of action independent of contract.'' This statement is logical as applied by illustration of injury by a cart driven into another vehicle, the cart bearing the name of a firm, of which the party sought to be held was not in fact a member. Here, however, the situation is entirely different; the evidence tends to show that, by reason of the ''holding out'' of the three doctors as partners (which they were in fact), the plaintiff was induced to seek aid from the firm and thus enter into a contractual relation, either with the firm or, without her knowledge, with one member of the firm.

Nor does the phrase "credit was given to the partnership" necessarily imply the sale of goods or the loaning of money alone. "Credit" is defined as reliance on the truth or reality of something; belief; faith; trust * * * ; trustworthiness; * * * that which procures or adds to reputation or esteem," with many like expressions. (Webster's Int. Dictionary.) When one, on the faith in the trustworthiness of a firm, gives to it his patronage, he is giving credit to the partnership.

The contention here made was urged in *Whittaker* v. *Collins,* 34 Minn. 299, 25 N. W. 632, 633, 57 Am. Rep. 55, an action against one of a firm of doctors for damages resulting from negligence. The court held that the suit was not a tort action, saying: "Where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance,—it is, in substance, whatever may be the form of the pleading, an action on the contract. * * * This is an action on the contract. The gist and *gravamen* is the breach of its terms, which, whether express or implied, were that these physicians and surgeons would treat the plaintiff with ordinary professional skill and care. * * * The act of one partner in the line of the copartnership business is the act of all." The court further declared that "there is no force in the suggestion" that one of the doctors was not a necessary party to the action because of his innocence.

In the case of *McDonald* v. *Dr. McKnight, Inc.,* 248 Mass. 43, 142 N. E. 825, 827, the "firm," a corporation, was held to be legally responsible for the negligence of an employee directed by one of the doctors to "take care of" the patient. The court said: "The defendant represented by signs that it was conducting a dental office, and there was evidence for the jury that the plaintiff desiring dental advice and assistance entered the office" where a tooth was extracted by the employee after one of the firm had directed the employee to take care of the patient, and held that the patient "had the right to 'trust to appearances,'" and that the defendant company could not avoid liability by evidence that the employee's au-

thority was limited. So, here, the plaintiff had a right to "trust to appearances." If the jury accepted her testimony, which is uncontradicted, that she called Dr. Haas because he was a member of the firm and expected to receive the benefit and experience of the firm, the jury might well find that she did in fact employ, and was a patient of, the firm, and any secret limit placed upon the authority of one of the firm, or as to division of compensation from the operations of a general partnership, not known to the plaintiff, cannot affect her right to look to those in whom she placed her trust, for damages for injuries resulting from the breach of the implied contract that she would be treated with due care. (Mechem's Elements of Partnership, 2d ed., 210, and cases cited.) While secret limitations on the authority of a partner are valid as between the partners, if not made known to the public, third parties may deal with the firm on the presumption that any act within the general scope of a partner, as agent of the firm, is within the authority of the partner with whom he deals. (*Winship* v. *Bank of United States*, 5 Pet. 529, 8 L. Ed. 216.)

The question whether the plaintiff was the patient of the firm or of Dr. Foss alone was for the jury to determine; if she was the patient of the firm, then nurse Cass was the agent and employee of the firm and all of the doctors are responsible for the damage done by her negligence, though no one of them was himself negligent.

The judgment is affirmed as to the Northern Pacific Railway Company and the Northern Pacific Beneficial Association, but as to the defendants Jennings, Haas and Foss the judgment is reversed for a new trial.

Mr. Chief Justice Callaway and Associate Justices Angstman, Stewart and Anderson concur.

Rehearing denied June 9, 1933.