PYLES, APPELLANT, v. MELVIN ET AL., RESPONDENTS.

(No. 6,366.)

(Submitted February 14, 1929. Decided March 15, 1929.)

[275 Pac. 753.]

Mr. *George W. Farr,* for Appellant, submitted a brief, and argued the cause orally.

Mr. *Wellington D. Rankin* and Mr. *C. J. Dousman,* for Respondents, submitted a brief and argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Plaintiff alleged that the defendants and other evilly disposed persons, names unknown, commencing about the 13th of July, 1924, and continuing thereafter for a considerable period of time, contriving and maliciously intending to hurt, wound and injure the plaintiff and to beat, bruise, wound and maltreat him, and to unjustly vex, molest and disturb him, and to cause him to be arrested and confined in the county jail and to suffer punishment and to be imprisoned for a long space of time and thus deprived of his liberty, and thereby to impoverish, oppress and wholly ruin him, did maliciously and wickedly conspire, combine and confederate and agree together amongst themselves and with divers other evilly disposed persons, names unknown, to carry their aforementioned designs into effect; and that defendants on the 14th of July, in pursuance of the conspiracy, wilfully, wrongfully, falsely and maliciously, without reasonable probable cause therefor, caused the plaintiff to be charged before a justice of the peace with having committed a felony, and afterwards caused the plaintiff to be charged in the district court with having committed the same crime with which plaintiff was charged in the justice's court, and caused plaintiff to be arrested and imprisoned in the county jail of Carter county, and while he was in jail the defendants, further in pursuance of the conspiracy, wrongfully and unlawfully sought to prevent him from obtaining sureties on a bail bond, in order that he might obtain his release from jail, and after he had obtained sureties on a bail bond, the defendants, further in pursuance of the conspiracy, endeavored to persuade and did persuade some of the sureties on the bail bond to withdraw therefrom, causing the plaintiff to be wrongfully and unlawfully confined and imprisoned in the jail; that he was unable to procure sureties by reason of the wrongful and unlawful acts of the defendants in persuading and preventing persons from going on

or becoming sureties on the bail bond, and who otherwise would have become sureties thereon except for the influence and persuasion of the defendants; by reason of all of which the plaintiff was confined in the county jail for a period of thirty-eight days; that the prosecution and charges against the plaintiff have been dismissed and the prosecution wholly terminated; and that by reason of the acts and conduct of the defendants plaintiff was damaged, etc.

Demurrers to the complaint having been overruled, the defendants answered by general denial. On November 7, 1927, the cause came on for trial before the court sitting with a jury, and upon conclusion of the plaintiff's testimony the court sustained a motion for nonsuit and entered judgment thereon. Plaintiff's motion for a new trial having been denied, he appealed to this court.

The plaintiff, a man twenty-six years of age, in 1924 was living near Chalk Buttes, in Carter county, Montana. He had lived there since 1910. One Laird, his brother-in-law, had been informed against for the crime of rape committed upon the daughter of the defendant Melvin Armstrong, had given bail and on the 13th of July was a fugitive from justice. Mr. Armstrong, incensed over the outrage and thinking the authorities remiss in their duty, appealed to his neighbors who agreed to meet at defendant Jim Keith's with the view of taking some action in the matter. On the evening of July 13, thirty or more men assembled at Keith's. A number of them were armed. There was some violent talk and it was suggested that they go directly to plaintiff's, the idea being to compel him to disclose the whereabouts of Laird, for they thought plaintiff had taken Laird out of the country.

In the meantime the sheriff got wind of the matter and upon the advice of the county attorney warned the plaintiff, advising him to go elsewhere. This plaintiff refused to do, saying that he proposed to stay at his home and to protect himself. For some reason or other the party did not enter the premises of plaintiff but proceeded to Ekalaka, the county seat,

where they arrived at 3 o'clock in the morning. Mr. Armstrong woke up Mr. Sheldon, the county attorney, telling him that there were some men downtown who wanted to see him on important business. The county attorney went to his office. Upon arriving there he found "a great number of cars out in Main Street" and men "scattered all around about the cars and on the street." The men filled his office and began to talk, four or five talking at once. They wanted action. Some demanded the enforcement of the law, some abused the county attorney for letting Laird get away, some abused him for other reasons. Some said they had intended to tar and feather the plaintiff, and others "mentioned that some of the fellows in the crowd wanted to hang him. Some preferred the tar and feather method, and others preferred the hanging method." The main purpose of the gathering originally, as the county attorney understood it, was that the crowd intended to make the plaintiff tell where Laird was. They then demanded that plaintiff be arrested for taking Laird out of the state. As to that nobody dissented, except the county attorney, who said he did not know of any statute under which the plaintiff could be arrested. But several of the men insisted there was; there must be. The parley continued until breakfast time; after breakfast it was resumed. Finally, the county attorney, after discussing the matter thoroughly, and having the benefit of counsel representing Armstrong and his friends, concluded to accuse the plaintiff as an accessory after the fact. Thereupon a complaint was filed with a justice of the peace, upon which a warrant was issued and the plaintiff arrested. There was no preliminary examination, but on July 19 an information charging plaintiff with being an accessory after the fact was filed by leave of court, the district judge fixing bail at $2,000. The proceeding before the justice of the peace was then dismissed. Upon bail being fixed, plaintiff employed Mr. Wheeler, an attorney at law, to procure a bond, which was done. The bond was in the penal sum of $2,000, signed by seven persons, each of whom quali-

343

fied to being worth the sum of $1,500 over and above all his just debts and liabilities, exclusive of property exempt from execution. The bond was sufficient on its face. Shortly after the bond was signed the defendant Armstrong, sometimes accompanied by one man and sometimes by another, visited the bondsmen and induced all of them to withdraw. Their procedure was as follows:

Mr. Armstrong and Mr. Mankin interviewed Mr. Nelson, one of the bondsmen. They told him that most of the rest of the bondsmen had withdrawn; said to him that if the plaintiff ever got out on bond he would leave the country and Nelson would have the bond to pay. He thereupon signed a written withdrawal from the bond. "In a way," Nelson testified, "they did coerce me in getting off the bond or I would not have went off the bond. * * * I did not get off the bond just exactly because I was glad to get off but just because the rest of them had withdrawn."

Armstrong and Mankin interviewed Haney. They told him he was the last one remaining upon the bond. They said to Haney that if they could detain plaintiff in jail he would not be able to keep Laird posted, but if he were out he would keep him posted, and that if released plaintiff likely would run away too. So Haney withdrew, but soon regretted his action.

Armstrong and the defendant Jim Keith interviewed bondsmen VanRansler and George Woodward, whose wife had signed the bond. They told these gentlemen that all of the rest of the bondsmen had "signed off" and they had another charge against the plaintiff. VanRansler asked Armstrong why they were holding plaintiff and why they did not let him get out and harvest his crop. Armstrong said he wanted to keep plaintiff inside so that he would not correspond with Laird.

Prior to that Armstrong and Keith had told Mrs. Woodward that she and VanRansler were the only ones who had not withdrawn from the bond. She signed a written withdrawal,

sealed it in a letter, gave it to Mr. Keith for delivery to Mr. Woodward, saying if Mr. Woodward decided that she should withdraw she would do so. Mr. Woodward consented to the withdrawal of his wife.

Armstrong and Mr. Lantis called upon Emory Stern, a bondsman, who testified that Armstrong told him "that they had all signed off and the bond was a bad one, and I had better come off it." The gist of Armstrong's talk to Stern was "that they had him [plaintiff] there and they would keep him there." So Mr. Stern withdrew.

Armstrong and Mr. Sheldon called upon William Sweeney, one of the bondsmen. Sweeney testified: "They said they thought it was a good thing that the bond was withdrawn, all of them, and I had better withdraw from the bond. That they thought he ought not to run at large any longer." So Sweeney withdrew.

Armstrong and Sheldon asked Strain to withdraw from the bond; they did not like to see him stay on the bond because they were friends of his. He withdrew.

Mr. Dage testified that during the month of July Armstrong said to him that "they were trying to keep Mr. Pyles from getting bail and keep him in jail."

Plaintiff was kept in jail for thirty-eight days.

Later the amount of bail was reduced to $1,500, whereupon Mr. VanRansler and Mrs. Woodward executed a bond which was approved by the district judge, and the plaintiff was released. The criminal action against plaintiff was dismissed by the county attorney on September 2, 1924.

Plaintiff's counsel concedes that upon the trial there was not sufficient proof to warrant a recovery upon the theory that there was a conspiracy to offer personal violence to plaintiff. It must be conceded also that the proof failed to show a conspiracy on the theory of malicious prosecution. Right or wrong, the county attorney thought there was probable cause for filing the complaint against this plaintiff and afterwards filing an information against him. He testified

that he made up his mind from what the sheriff had told him of Laird's disappearance and from what he was told by defendants and others in their company. So far as he knew, he said, none of the defendants was guilty of any misrepresentation which caused him to start the prosecution. As we held in *Halladay* v. *State Bank of Fairfield*, 66 Mont. 111, 212 Pac. 861: "Where a county attorney starts a criminal proceeding upon a full and fair statement of the facts by the accuser he acts as much for the state as if he had proceeded upon his own personal knowledge, and the informant cannot be held liable in an action for malicious prosecution."

We come now to the question whether the complaint states ██ ██ a cause of action upon the theory that the defendants, or some of them, wrongfully caused plaintiff's bondsmen to withdraw, thus preventing plaintiff from giving bond and, as a result of which, plaintiff was kept in jail. While the complaint is not a model we think it does state a cause of action upon this theory, and that, upon the motion for a nonsuit the proof tended to support plaintiff's action against the defendants Armstrong and Keith. The oft-repeated rule is that upon a motion for nonsuit the evidence must be taken in the light most favorable to plaintiff, and deemed to establish whatever it fairly tends to prove; every legitimate inference that may be drawn from the facts is to be considered in plaintiff's favor; no cause should ever be withdrawn from the jury unless the conclusion from the facts necessarily follows as a matter of law that no recovery can be had upon any view which reasonably can be drawn from the facts which the evidence tends to establish. (*Boyd* v. *Great Northern Ry. Co.*, ante, p. 84, 274 Pac. 293; *Puutio* v. *Roman*, 76 Mont. 105, 245 Pac. 523; *McCabe* v. *Montana Central Ry. Co.*, 30 Mont. 323, 76 Pac. 701.)

By the Constitution and statutes of this state the defendant was entitled to bail. The evidence shows that he was prevented from obtaining it by the wrongful acts of the defendant Armstrong and those aiding and abetting him; but of

these Keith was the only one who was joined as a defendant. The representations made to the bondsmen by Armstrong and his coadjutors were not made out of solicitude for the bondsmen, but with the design and purpose of preventing the plaintiff from obtaining bail in order to keep him in jail. Woodward, VanRansler, Haney and Stern in turn were told that all of the rest of the bondsmen had withdrawn. The same inference was left with Sweeney, and it seems with Nelson. The statement that all the rest had withdrawn manifestly was false except as to the last bondsman who was approached. This false representation, made for the purpose of keeping plaintiff in jail, was wrongful, and under the circumstances malicious. It deprived plaintiff of his liberty, worked injury and damage to him. If Armstrong and his friends had not persuaded the bondsmen to withdraw, plaintiff undoubtedly would have been released from custody. As it was he was compelled to remain in jail many days, the result, as the case stands on the motion for nonsuit, of wrong conduct on part of Armstrong and those abetting him. It would be a reproach to the law if these facts did not justify an award of damages. (*Puutio* v. *Roman,* supra.)

*Gibbs* v. *Randlett,* 58 N. H. 407, has similar features. There it was the duty of the sheriff to take bail, duly offered by the plaintiff, and discharge him from arrest. The defendant was present at the arrest and offer of bail and ordered the sheriff to refuse it. The sheriff did as directed by the defendant and thereby committed the wrongful act, for which the defendant was held liable.

We do not mean to imply that one may not in good faith, having the best interest of a bondsman at heart, advise the bondsman either to refrain from signing a bond, or withdrawing from it after he has signed. But that is not the case here. There is nothing in *Labar* v. *Batt,* 56 Mich. 589, 23 N. W. 325, cited by counsel for defendants, which militates against our holding in this case.

For every wrong there is a remedy. (Sec. 8752, Rev. Codes 1921.) Counsel have spent some time in argument respecting the character of this action. Here form and nomenclature are unimportant. Does the plaintiff set forth facts which call to his aid the public force? The answer is in the affirmative. Under the common law the action would have been upon the case. That action was held to lie generally to recover damages for torts not committed with force, actual or implied. (1 Chitty, Pl., 132.) That all the defendants urged the arrest of the plaintiff may be admitted. But the proof does not disclose that any of them, except Armstrong and Keith, ever had in mind preventing plaintiff from being released on bail. That seems to have been an afterthought.

The rule, as stated by the supreme court of Georgia, is ▉▉ that "even if the common design was unlawful, and if one member of the party departed from the original design as agreed upon by all of the members, and did an act which was not only not contemplated by those who entered into the common purpose, but was not in furtherance thereof nor the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor. (See 6 Am. & Eng. Ency. Law, 2d ed., 870–872; 1 Bishop New Crim. L., sec. 634 (2); *Ferguson* v. *State,* 32 Ga. 658.)" (*Handley* v. *State,* 115 Ga. 584, 41 S. E. 992.)

While the parties are responsible for consequent acts growing out of the general design, they are not for independent acts growing out of the particular malice of individuals. (*Martin* v. *State,* 89 Ala. 115, 18 Am. St. Rep. 91, 8 South. 23, citing 1 Wharton's Crim. Law, sec. 397.)

Furthermore, if a plaintiff fails in the proof of a conspiracy or concerted design he may yet recover damages against one or more of the defendants shown to be guilty of the tort without such agreement. The charge of conspiracy where unsupported by evidence will be considered mere surplusage not necessary to be proved to support the action. (12 C. J. 585;

*Howland* v. *Corn,* 232 Fed. 35, 146 C. C. A. 227; *Doremus* v. *Hennessy,* 62 Ill. App. 391; affirmed 176 Ill. 608, 68 Am. St. Rep. 203, 43 L. R. A. 797, 52 N. E. 924, 54 N. E. 524; *Warfield* v. *Adams,* 215 Mass. 506, 102 N. E. 706.)

It follows that the court erred in sustaining the motion for nonsuit and entering judgment thereon.

The judgment is reversed and the cause is remanded for a new trial as to the defendants Melvin, Armstrong and Jim A. Keith.

ASSOCIATE JUSTICES MATTHEWS, GALEN, ANGSTMAN and FORD concur.

Rehearing denied April 3, 1929.