STAFF, Respondent, *v.* MONTANA PETROLEUM CO., Appellant.

(No. 6,645.)

(Submitted June 24, 1930.   Decided July 19, 1930.)

[291 Pac. 1042.]

*Messrs. Loud & Leavitt,* for Appellant, submitted an original and a reply brief; *Mr. Charles H. Loud* argued the cause orally.

*Mr. D. R. Young* and *Messrs. Murphy & Whitlock,* for Respondent, submitted a brief; *Mr. Young* and *Mr. M. N. Whitlock* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

This action was brought by plaintiff against defendant to recover damages for personal injuries alleged to have been sustained by her from burns resulting from an explosion of natural gas.

The complaint alleges that defendant is a public utility engaged in furnishing natural gas for use in the city of Baker; that plaintiff owned and resided in a residence located in Baker, equipped for the use of natural gas furnished by defendant through mains owned by it; that gas was conveyed

from defendant's mains into the cellar underneath her residence through service pipes belonging to her; that the meter used for measuring the gas consumed was located in plaintiff's cellar and belonged to defendant. It is alleged that on the twenty-seventh day of October, 1928, a large amount of natural gas from the supply furnished by defendant had escaped into plaintiff's cellar, and on that day one Livingston, a servant and employee of defendant, came to plaintiff's house for the purpose of reading the meter; that, while there, plaintiff reported to him that the cellar was full of gas, and pursuant to the information he went to the cellar to discover the cause for the presence of gas and shortly thereafter was followed by plaintiff, both carrying flashlights; that it was the custom and practice of defendant, when escaping gas was reported, to investigate the source thereof and, if it escaped from the meter or other equipment of defendant, to repair the same; that when plaintiff reached the cellar she found Livingston standing in front of the meter examining the same; and that he thereupon negligently and carelessly lighted a match, causing the gas, which was inflammable, to ignite and explode, and as a result plaintiff suffered the injuries described in detail.

Defendant denies that it was its duty or custom to investigate the source of escaping gas, and alleges that gas was furnished to plaintiff in accordance with its printed regulations approved by the Public Service Commission of the state and made a part of plaintiff's contract; denies that any gas had escaped into plaintiff's cellar, and denies that Livingston had any authority to make any investigation as to escaping gas, if any had escaped, or to make any inspection of the service pipe of plaintiff; and alleges that the sole duty of Livingston at the time was to read meters, and that if he went into plaintiff's cellar he did so at the request of plaintiff and was not at that time in the employ of defendant; his general employment by defendant is admitted. The allegations of the complaint as to the nature and extent of the injuries are denied.

Defendant sets up two affirmative defenses. In one it is alleged that before natural gas is furnished, an agreement or

application is made by the consumer whereby the terms and conditions under which gas shall be sold, and the duty and liability of defendant in connection with the distribution and sale of gas, are set forth, and that plaintiff executed such an application which was in force and effect at the time of the accident; that if there was any gas in plaintiff's cellar it had resulted from her fault in failing to discharge the obligation imposed under the application or contract to keep the service pipes in a proper state of repair; and that its presence in the cellar did not result from any negligence upon the part of defendant. In the second affirmative defense it is alleged that if Livingston went into the cellar for the purpose of detecting a leak, he did so at the request of plaintiff and at the time of the explosion was employed by her and was not in the employ of defendant.

Issue was joined by reply, and trial was had by jury. At the close of plaintiff's evidence, defendant moved for a nonsuit, which was denied, and, at the conclusion of all the evidence, for a directed verdict, which was likewise denied. The trial resulted in verdict and judgment for plaintiff in the sum of $15,700.40; defendant's motion for a new trial was denied, and it appeals from the judgment.

It is contended by defendant: (1) That there is not any evidence showing, or tending to show, that Livingston was at the time of the explosion acting within the scope of his employment; (2) that under the evidence it appears that the gas escaped into plaintiff's cellar from her service pipes, which defendant owed no duty to inspect or repair, and that plaintiff's failure to keep the service pipes in repair was negligence upon her part and caused or contributed to the damage; (3) that plaintiff was guilty of contributory negligence in going into the cellar immediately before the explosion; (4) that the verdict is excessive; and (5) that the court erred in its instructions to the jury.

1. We undertake a consideration of the question of the insufficiency of the evidence having in mind the well-established rules that upon a motion for a nonsuit or directed

verdict, the evidence must be viewed from the standpoint most favorable to plaintiff, and that every fact must be deemed to be proven which the evidence tends to prove (*Rau* v. *Northern Pacific Ry. Co.*, 87 Mont. 521, 289 Pac. 580; *Chowning* v. *Madison Irr. Co.*, 84 Mont. 494, 276 Pac. 946; *Robinson* v. *F. W. Woolworth Co.*, 80 Mont. 431, 261 Pac. 253), and that "no cause should ever be withdrawn from the jury unless the conclusion from the facts necessarily follows as a matter of law that no recovery can be had upon any view which reasonably can be drawn from the facts which the evidence tends to establish" (*Pyles* v. *Melvin Armstrong*, 84 Mont. 338, 275 Pac. 753, 755; *Boyd* v. *Great Northern Ry. Co.*, 84 Mont. 84, 274 Pac. 293; *Puutio* v. *Roman*, 76 Mont. 105, 245 Pac. 523); and although the evidence may have been insufficient at the close of plaintiff's case, if defendant has supplied the deficiency, no error was committed. "By failing to stand upon its motion for nonsuit, defendant assumed the risk that its own evidence might aid plaintiffs' case." (*Pure Oil Co.* v. *Chicago, M. & St. P. Ry. Co.*, 56 Mont. 266, 185 Pac. 150, 151; *Slack* v. *Brown*, 61 Mont. 99, 201 Pac. 565; *Burden* v. *Elling State Bank*, 76 Mont. 24, 46 A. L. R. 906, 245 Pac. 958; *Liston* v. *Reynolds*, 69 Mont. 480, 223 Pac. 507.) If there is substantial evidence to support the judgment, it will not be set aside upon the ground of insufficiency, even though the evidence is conflicting. (*Chowning* v. *Madison Irr. Co.*, supra; *Robinson* v. *F. W. Woolworth Co.*, supra; *Independent Milk & C. Co.* v. *Aetna Life Ins. Co.*, 68 Mont. 152, 216 Pac. 1109.)

The evidence shows that two or three days prior to the twenty-seventh day of October, 1928, plaintiff detected an odor in the cellar and kitchen, and, as it became more pronounced, she concluded it was caused by escaping gas. During the morning of that day Livingston, an employee of defendant, came to her residence to read the meter and went to the cellar where it was located. After reading the meter he returned to the kitchen and was told by plaintiff that there was a leak of gas; "that the cellar was full of gas." He then returned to the cellar. Plaintiff followed him, and when she reached the

cellar he was standing directly in front of the meter and looking at it. He was in this position when he struck a match. Plaintiff gave Livingston the information because she knew that he was employed by defendant and she thought he would locate the trouble. The service pipes had been examined by Livingston, employed by the city for that purpose, and found to be in good order, and by reason of that fact plaintiff thought the meter was the source of the trouble. The meter was owned by defendant, and under the regulations and application under which gas was furnished to plaintiff, the service pipes were subject to the inspection and control of defendant. The application recites: "Customer [plaintiff] shall notify the company immediately upon the discovery of any leak of gas either in the main pipe, service pipe, connections or fixtures in order that the company may as soon as possible shut off the gas until the necessary repairs are made. The company shall have the right to enter upon the said premises, disconnect the service pipe of the applicant by shutting off the supply of gas for any or either of the following reasons: 1st, for inspection and repairs."

An investigation after the explosion disclosed that the gas escaped from plaintiff's service pipes outside the house. Considering this evidence in the light most favorable to plaintiff, as we must, we think the reasonable inference to be drawn from it is that plaintiff thought the leak of gas was in the meter, as her service pipes had been only recently tested, and that Livingston, who had made the test, shared her belief is indicated by the fact that when plaintiff reached the cellar she found him in his efforts to locate the leak standing in front of the meter with his flashlight playing upon it. Plaintiff testified that it was the duty of defendant to oversee the installation and repair of service pipes; that she never employed Livingston and that he was employed by defendant as their expert, and was working for it. With this condition of the evidence at the close of plaintiff's case, we think plaintiff made out a prima facie case, and the court did not err in denying defendant's motion for a nonsuit.

But defendant did not stand on its motion. The manager ██ of defendant testified: "Mr. Livingston has a good deal of responsibility in connection with the company; a man that looks after these gas wells and gas mains has responsibility. When he is out reading meters, as he was that day, if he should come across a leak in the mains belonging to the company it was his duty to take proper steps to fix it up and I wouldn't consider he was exceeding his authority if he did that. Whenever he runs into any situation which might be termed an emergency that arises in connection with the company affairs he has the authority and it is his duty to protect the company's interest and I think his authority on the twenty-seventh day of October in that respect was just the same as it had been during all the rest of his employment. * * * We generally give advice within certain limits whenever customers have reported to the company any defects or any trouble in the burning of gas and I believe that Mr. Livingston has done the same thing. I don't think anything has been said or any instructions given to him; I wouldn't say I consider that as being out of his line of duty. I am interested in having the burning of gas satisfactory to the customers and am interested in the welfare of the consumers and satisfactory service, and within certain limits I consider it the duty of the employee to do everything he can to advance that service. * * * When a meter is discovered to be defective in order to have it register correctly or a leak is shown to us we sometimes repair it or put in a new meter. * * * If we discover any leak we do not put it back again; it wouldn't register correctly if we didn't repair it and if we did discover it we repaired it. * * * If they call our attention to leaks, and the leak is in the meter, we repair that leak; but we don't go out and hunt leaks."

Taking this testimony in connection with the provisions of plaintiff's application, we think the jury was justified in finding that Livingston was acting for defendant and within the scope of his authority in going to the cellar to investigate the cause of escaping gas. The law on the question of scope of

154

employment is well settled in this state. In *Ellinghouse* v. *Ajax Livestock Co.*, 51 Mont. 275, L. R. A. 1916D, 836, 152 Pac. 481, 485, this court in considering the question said: "It remains, then, to inquire whether they were acting within the scope of their employment. In determining this question the inquiry is not, Was the servant at the particular time acting in obedience to the direction of the master? but, Was he acting in furtherance of his master's business? A servant may abandon his master's employment for the time to accomplish some purpose of his own. If in accomplishing this purpose he does an injury to another, his master is not liable; but a mere deviation from the master's directions with reference to the business in which he is employed is not an abandonment of his employment, and so long as he is doing some act in furtherance thereof he will be regarded as acting within its scope, and the master will not be excused on the ground that he did not authorize the particular act, or that he had no knowledge of it, or that in doing it the servant exceeded his authority, or, again, that he did it at a place to which his duty did not call him. (*Barmore* v. *Vicksburg etc. Ry. Co.*, 85 Miss. 426, 3 Ann. Cas. 594, 70 L. R. A. 627, 38 South. 210; *Geraty* v. *National Ice Co.*, 16 App. Div. 174, 44 N. Y. Supp. 659; *Higgins* v. *Watervliet T. & R. Co.*, 46 N. Y. 23, 7 Am. Rep. 293; *Rounds* v. *Delaware, L. & W. R. Co.*, 64 N. Y. 129, 21 Am. Rep. 597; *Evansville & T. H. R. Co.* v. *McKee*, 99 Ind. 519, 50 Am. Rep. 102.) 'The rationale of the master's liability for tortious acts which "come within the scope of the servant's general duty, although in doing the particular act complained of he may have exceeded his authority," is that, in most cases where a duty is to be performed or an act done by a servant, some discretion must be vested in him to whom the doing of it is committed; and, where this is so, the master cannot enjoy the benefit of his servant's acts which involve this discretion without being responsible for their result. The rule is held especially applicable "where the master is absent, and the duty to be performed vicariously is general in character, as in

the case of conductors of public vehicles, railway servants and the like.'' '   (6 Labatt on Master and Servant, 6868.) ''

Again, in *Wegge* v. *Great Northern Ry. Co.*, 61 Mont. 377, 203 Pac. 360, 362, this court used this language: ''Long ago, the Supreme Court of the United States repudiated subtle refinements in fixing the moment when the relation of employee and employer begins and when it ends.  (*Philadelphia & R. Ry. Co.* v. *Derby,* 14 How. (U. S.) 468, 14 L. Ed. 502 [see, also, Rose's U. S. Notes] ; *New Jersey Steamboat Co.* v. *Brockett,* 121 U. S. 637, 30 L. Ed. 1049, 7 Sup. Ct. Rep. 1039.) The distinctions involved in the term 'scope of authority' are not to be drawn so fine that a particular act may be declared upon as a matter of law, unless the evidence is in such condition that reasonable men will not be likely to differ in its interpretation.  If the act 'be done in the course of his [the servant's] employment, the master is liable; and it makes no difference that the master did not authorize, or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable if the act be done in the course of his servant's employment.' ''   To the same effect are *Kirk* v. *Montana Transfer Co.*, 56 Mont. 292, 184 Pac. 987; *Grorud* v. *Lossl,* 48 Mont. 274, 136 Pac. 1069; *Hoffman* v. *Roehl,* 61 Mont. 290, 20 A. L. R. 189, 203 Pac. 349.

2. It is argued by counsel that it affirmatively appears that plaintiff was negligent in failing to keep the service pipes in a good state of repair, whereby gas escaped from these pipes into the cellar, and that such negligence contributed to her injury and was a proximate cause, without which the accident would not have occurred.

It is clear from the evidence that the injuries sustained by plaintiff resulted from an explosion of gas, and we think it equally clear that Livingston was negligent in lighting a match under the circumstances.  He was a gas expert and knew that the gas was highly inflammable, and had been told by plaintiff that the cellar was ''full of gas''; yet with this information the only test made by him prior to striking the match was to smell and feel along the service pipes .  The

uncontradicted testimony shows that ordinary safety rules which apply in dealing with gas prohibit the use of a fire, match, or candle. Clearly, under these facts, it cannot be seriously contended that such conduct on Livingston's part was not negligent. Gas is a dangerous substance and was known to be such by Livingston; the duty was imposed upon him to use a degree of care commensurate with the danger involved. If he failed to exercise this degree of care, defendant is liable for the injury resulting from such negligence, provided plaintiff was free from fault contributing to the injury. (28 C. J. 591; *Southern Gas Co.* v. *Tyner*, 49 Ind. App. 475, 97 N. E. 480; *Chisholm* v. *Atlanta Gas-Light Co.,* 57 Ga. 28; *Emerson* v. *Lowell Gas Light Co.*, 3 Allen (Mass.), 410; *Pine Bluff W. & L. Co.* v. *Schneider*, 62 Ark. 109, 33 L. R. A. 366, 34 S. W. 547; *Consolidated Gas Co.* v. *Crocker*, 82 Md. 113, 31 L. R. A. 785, 33 Atl. 423; *Nonnamaker* v. *Kay County Gas Co.*, 123 Okl. 274, 253 Pac. 296; *Memphis Consol. Gas & Electric Co.* v. *Creighton*, 183 Fed. 552, 106 C. C. A. 98.) This principle has been recognized and approved in *Bourke* v. *Butte Elec. & P. Co.*, 33 Mont. 267, 83 Pac. 470, and *Henroid* v. *Gregson Hot Springs*, 52 Mont. 447, 158 Pac. 824.

Plaintiff's service pipes had been examined by Livingston ▆ two weeks before the accident, and she had no reason to believe that they were out of order; when she discovered that gas was leaking she took action and notified defendant by advising Livingston, its employee and gas expert. The source of the escaping gas was not discovered until some time after the explosion. Under these circumstances plaintiff did what any reasonable person would have done—notified defendant's employee and expert to the end that the cause of the leak might be discovered and repaired. The proximate cause of the explosion was the negligent lighting of the match by Livingston. The explosion and injury to plaintiff resulted from the negligent act of Livingston in the presence of a known danger, the improper and careless handling of a dangerous condition which was brought to his attention by plaintiff. In other words, the striking of the match—the

proximate cause—was the efficient cause. But assuming, without deciding, that plaintiff was negligent in allowing gas to accumulate in the cellar, this was nothing more than a condition, as distinguished from a cause. (*Andree* v. *Anaconda Copper Min. Co.*, 47 Mont. 554, 133 Pac. 1090; *Monson* v. *La France Copper Co.*, 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Kern* v. *Payne*, 65 Mont. 325, 211 Pac. 767.)

A similar case was before the court of appeals of New York, where the same contention was made as in the case before us. In discussing the question the court said: "There was no evidence that the plaintiff's father was in any respect at fault for the break in that portion of the pipe from which the gas escaped. But concede it to be otherwise, and that in a drunken fit he had staggered against it and caused it to spring a leak. It is difficult to see how that contribution to the injury (if it may be so regarded), should shield the defendant. As well might an unskillful or careless surgeon, called to ascertain if a fracture existed and its location, excuse himself for negligence in respect to it by proving that his patron, being intoxicated, fell from a horse and caused the fracture." A concurring judge had this to say: "It does not appear how the crack in Mr. Lannen's pipe, through which the gas escaped, was occasioned. There is certainly no evidence that it was occasioned by the negligence of plaintiff's parents. It is, however, wholly immaterial how the gas came into the cellar. It was entirely harmless there, except to persons inhaling it. If not interfered with, it had no tendency whatever to produce the accident complained of. It was a very explosive fluid, and the accident was caused by the explosion, and that was caused by the lighted match; and the only negligence, in any way connected with the accident, was in lighting the match in the cellar." (*Lannen* v. *Albany Gaslight Co.*, 44 N. Y. 459.)

The rule is stated by the supreme court of Illinois in the following language: "If the negligence does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent

act of a third person, the two are not concurrent, and the existence of the condition is not the proximate cause of the injury." (*Seith* v. *Commonwealth Electric Co.*, 241 Ill. 252, 132 Am. St. Rep. 204, 24 L. R. A. (n. s.) 978, 89 N. E. 425, 428.) To the same effect are *Curran* v. *Chicago & W. I. R. Co.*, 289 Ill. 111, 124 N. E. 330; *Cole* v. *German Savings & Loan Soc.*, 124 Fed. 113, 63 L. R. A. 416, 59 C. C. A. 593; *Thubron* v. *Dravo Contracting Co.*, 238 Pa. 443, Ann. Cas. 1914C, 252, 44 L. R. A. (n. s.) 699, 86 Atl. 292; *Independent Ice Cream Co.* v. *United States Ice Cream Co.*, 69 Misc. Rep. 623, 125 N. Y. Supp. 1106; Cooley on Torts, 3d ed., 99; Wharton on Negligence, 2d ed., sec. 134.)

We are of the opinion that this contention of defendant cannot be sustained.

3. There is no merit in defendant's contention that plaintiff ▮▮▮ was guilty of contributory negligence in going into the cellar immediately before the explosion. She had advised Livingston of the condition existing in the cellar; she was interested in the investigation he was making and the source of the escaping gas; she had no reason to believe that he would light a match or do any negligent act; manifestly it cannot be said that she was guilty of contributory negligence.

4. The jury returned a verdict in favor of plaintiff for ▮▮▮ $15,700.40, and it is insisted that the award is excessive. The testimony shows that plaintiff's face is permanently scarred and disfigured; the little finger and thumb on one hand are practically useless, and the wrist is stiff; both ears are partially burned off, the nose badly burned, the nostrils contracted, and the face and mouth drawn. She is permanently disabled for her household duties to the extent of at least fifty per cent. Plaintiff testified that her clothing was practically burned from her body; the clothing continued to burn while she ran upstairs, and finally the fire was smothered out in her bedroom. "I don't see how anybody could suffer as much as I did and live." She was in the hospital for five weeks and under the influence of opiates for four weeks of that time. "The arms were pieces of raw meat for five

weeks—no skin on them at all. * * * It is hard to explain your mental reaction, but there is nobody that likes to go through life scarred. I think I probably shed more tears over the scars than I did over the pain." The pain from contraction and drawing lasted for several months.

The attending physician testified that plaintiff suffered severe shock and burns on her face, arms, neck and shoulders, and that the burns were severe, and he described a part of them as "third degree burns," of considerable depth; that the neck, face and one shoulder and arm will be permanently scarred; that plaintiff's life was in serious danger; and that there is permanent disability resulting to the neck, forearms and both hands, caused by the contraction and scarred tissues.

No hard-and-fast rule can be laid down for fixing compensation in cases of this character. "In the very nature of things there can be no fixed measure of compensation; nor may the award in any given case be accepted as a conclusive standard in any other case, because, it being the province of the jury to determine what the amount shall be, the sums awarded in different cases vary as widely as do the individual views, capacities and dispositions of the men who constitute juries, chosen, as they are, by lot from the body at large of the citizens of the community. So long as we have a system which confides to juries the duty to determine the issues involved in this character of cases and to fix the amount of compensation to be paid, unless the result of their deliberation is such as to shock the conscience and understanding, it must be accepted as conclusive." (*White* v. *Chicago etc. Ry. Co.*, 49 Mont. 419, 143 Pac. 561, 564.)

The rule is thus stated by the supreme court of the United States in *City of Panama* v. *Phelps*, 101 U. S. 453, 464, 25 L. Ed. 1061: "When the suit is brought by the party for personal injuries, there cannot be any fixed measure of compensation for the pain and anguish of body and mind, nor for the permanent injury to health and constitution, but the result must be left to turn mainly upon the good sense and deliberate judgment of the tribunal assigned by law to

ascertain what is a just compensation for the injuries inflicted.''

Plaintiff's age does not appear from the record, but a photograph taken less than a year before the injury is before us as an original exhibit and shows plaintiff a woman in early middle life, in good health, and of good appearance. At the time of the injury she was not engaged in a remunerative occupation, but was engaged as a housewife, although a teacher by profession. Her ability to perform her household duties is permanently impaired at least fifty per cent. In addition to the shock to the nervous system, the excruciating pain already suffered, she will continue to suffer mortification and humiliation such as naturally come to her by reason of permanent scars upon her face, neck and arms. The trial court and jury had an opportunity to observe the extent and nature of the scars and disfigurements which she sustained and must carry through life. The learned trial judge, in passing upon the motion for a new trial, was in a position to have reduced the verdict had he, in the exercise of a sound discretion, deemed the damages excessive, but instead he refused to interfere and permitted the verdict to stand, and we are not in a position to intelligently challenge the judgment of court and jury, with nothing of a substantial nature before us to support a contrary conclusion.

5. By instruction No. 13, the court advised the jury: ''You ____ are instructed that it is negligence as a matter of law to strike a match in a cellar or room known to be full of gas, or where a person striking such match has reasonable cause to believe that there is a quantity of gas.'' Counsel object to this instruction and insist that it ''amounts to a peremptory command to find for plaintiff,'' and that the words ''a quantity of gas'' may include ''a small as well as a large amount, so that a trace of gas would be included in this phrase.'' We do not think the instruction susceptible of the construction placed upon it by counsel. Reading the entire instruction, it means nothing more than that it is negligence to strike a match in a room or cellar containing a large

or substantial amount of gas which was known to exist or there was reasonable cause to believe existed. "If one has notice that gas is present in large quantities, it is negligence for him to apply a lighted match to it." (28 C. J. 598; *Consolidated Gas Co.* v. *Crocker*, 82 Md. 113, 31 L. R. A. 785, 33 Atl. 423; *Pine Bluff W. & L. Co.* v. *Schneider*, supra.) The only evidence touching the quantity of gas in the cellar was that of plaintiff, and she says that she advised Livingston that the cellar was "full of gas"; while this was denied by him, the conflict was properly left for the jury.

By instruction No. 25, the jury was told that, if "Livingston acted in an ordinary and prudent manner and as an ordinary and prudent person would have acted under the same or similar circumstances, then the defendant would not be liable in this action." Manifestly, in view of this instruction, it cannot be said that the jury was told as a matter of law that Livingston was negligent.

We have examined other instructions given by the court to which defendant objected, and those offered by it and refused by the court, and find no error in the court's rulings thereon.

For the reasons stated the judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, GALEN and ANGSTMAN concur.

Rehearing denied September 29, 1930.